[No. 25693-9-I.   Division One.   March 2, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD D. WEBB, *Appellant*.

*Andrew P. Zinner* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

PEKELIS, J. — Richard D. Webb appeals from his convictions for second degree burglary and second degree malicious mischief, contending that the trial court erred by admitting into evidence his statement to police and his alleged statement to his then-wife, and by refusing to submit his proposed jury instruction. Webb also appeals his sentence, asserting that his second degree burglary and second degree malicious mischief convictions encompassed the same criminal conduct for purposes of calculating his offender score under the Sentencing Reform Act of 1981 (SRA). We affirm the conviction, but remand for resentencing.

## I

After almost 3 years of marriage, Richard Webb and his wife, Sheryl A. Webb (hereinafter referred to by her given surname, Metcalf) agreed to a trial separation. On February 28, 1989, Webb moved out of the couple's rented apartment and gave his apartment key to Metcalf, leaving her in sole

possession. Metcalf testified that when the couple later began dividing their possessions, Webb became upset and left the apartment before they had finished. Metcalf testified that she finished dividing the couple's possessions and, at the end of April 1989, removed Webb's possessions from the apartment. On or about May 19, 1989, Metcalf commenced an action for dissolution of the marriage.[1]

On May 27, 1989, Metcalf was about to leave town for the weekend. Metcalf testified that before she left, Webb called her on the phone and told her, "Don't be surprised when you get back; there is [sic] a few surprises waiting for you." When Metcalf asked Webb what he meant by his statement, Webb replied, "You'll see."

When Metcalf returned to her apartment the next day, on May 28, 1989, she found it had been vandalized. Many of Metcalf's possessions had been slashed with a knife; nail polish was strewn on the walls and furniture; the cassette door on her stereo was broken off; and a number of other items in the apartment were also damaged. The damaged items included both community and separate property. The value of the damage was estimated by the State's expert witness to be in excess of $900. Webb's expert witness estimated the damage to be approximately $380.

Everett Police Officer Frank Gibson went to Metcalf's apartment to investigate. Metcalf identified a small knife found in the apartment as belonging to Webb. The knife had a money clip on it, and the blade was bent. Officer Gibson left the apartment to locate Webb. Officer Gibson found Webb at his parents' residence. The events that transpired thereafter are in dispute. Officer Gibson testified that after he identified Webb, he advised him of his *Miranda* rights. According to Officer Gibson, Webb indicated that he understood his rights and agreed to answer questions. Officer Gibson testified that he showed the knife to Webb who identified it as his. Webb told Officer Gibson the knife had last been in his possession the previous night, on May 27,

---

[1]The marriage was dissolved on November 1, 1989.

1989. Officer Gibson then presented Webb with a printed *Miranda* rights form which Webb filled out. At that point, Webb asked to see an attorney. Officer Gibson arrested Webb and transported him to jail. Officer Gibson testified that he did not question Webb further after his arrest.

Officer Gibson testified that at one point during his contact with Webb, Webb asked him to advise him of the crime for which he was being charged. Officer Gibson told Webb he was being charged with burglary. Officer Gibson also testified that, while being booked, Webb stated, "But the stuff I damaged was mine too." Officer Gibson testified that Webb's statement "sounded kind of defensive", but was not made in response to any question or statement by Officer Gibson or other police personnel.

Webb testified that, while being booked, he told Officer Gibson he did not wish to waive his *Miranda* rights. Webb testified that he then asked Officer Gibson "if all this is necessary". According to Webb, Officer Gibson began "yelling and screaming and said, 'You're damn right this is necessary. You went in and vandalized Sheryl's apartment.' " Webb testified that he responded to Officer Gibson's outburst by "simply stat[ing] that the items that were supposedly damaged also belonged to me." According to Webb, Officer Gibson then asked him "what gave me the right to go in and destroy property that also belonged to Sheryl."

On July 18, 1989, an information was filed charging Webb with second degree burglary. The information was amended on December 12, 1989, to add a second count, second degree malicious mischief.

On January 9, 1990, a pretrial hearing was held pursuant to CrR 3.5 to consider the admissibility of Webb's statement to Officer Gibson that the property Webb damaged also belonged to him. Webb argued that the statement should be excluded because it was induced by Officer Gibson's statement accusing him of vandalizing the apartment, which, according to Webb, constituted impermissible interrogation. However, the trial court held that Webb's

statement was admissible and entered the following conclusion:

### CONCLUSION OF LAW NO. 4
The statement made at the jail was not a product of the interrogation. Even if the officer had the outburst described by defendant, the outburst would not have been designed to illicit [*sic*] an incriminating response. The defendant's statement was voluntary and was in no way encouraged by anything the officer said or did.

At trial, Webb made a motion in limine to exclude his alleged statement to Metcalf that he had a surprise waiting for her. Webb argued that the alleged statement was protected under the marital communications privilege. The trial court initially granted Webb's motion. However, when the State renewed its request at trial to admit the alleged statement in order to rebut Webb's testimony that he entered the apartment without criminal intent, the trial court reversed its original ruling, and the alleged statement was admitted.

Webb admitted entering the apartment and damaging some property inside, but denied that he had the requisite criminal intent. He testified that while intoxicated, he went to the apartment the night Metcalf was away to "check the security". Webb testified further that he entered the apartment through the front door, which he said was unlocked, and inadvertently damaged some property while inside. He did not remember causing much of the damage that occurred. Webb denied making the statement to Metcalf that he had a surprise waiting for her. On rebuttal, Metcalf testified that Webb called her and stated that he had a surprise waiting for her. Metcalf testified that most of the damaged items were wedding gifts that had been given to the couple or otherwise had sentimental value to her. Both Webb and Metcalf testified as to how and when the damaged property had been acquired. Webb also testified that until October 1989, he had expected to get back together with Metcalf.

The jury was instructed that to convict Webb of second degree malicious mischief, it must find that he knowingly

and maliciously damaged the "property of another" in an amount exceeding $250. Webb took exception to the trial court's refusal to submit his proposed instruction 16, which defined separate and community property, and which advised the jury that each spouse had the authority to dispose of community property.

The jury found Webb guilty of second degree burglary and second degree malicious mischief. Judgment and sentence was entered February 20, 1990.

## II

On appeal, Webb contends first that his statement to Officer Gibson that the property he damaged also belonged to him was improperly admitted into evidence because, according to Webb, it was made in response to improper interrogation.

The fifth and fourteenth amendments' proscription against compelled self-incrimination requires that any custodial interrogation of a suspect be preceded by advice that the suspect has the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). If the suspect thereafter requests an attorney, the interrogation must cease until an attorney is present. *Miranda*, 384 U.S. at 474. The United States Supreme Court has stated that " '[i]nterrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnote omitted.) *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); *accord, State v. Sargent*, 111 Wn.2d 641, 650-51, 762 P.2d 1127 (1988). However, because the police should not be held accountable for the unforeseeable results of their words or actions, "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Footnote omitted.) *Innis*, 446 U.S. at 302.

Here, Webb testified that, while being booked, he asked Officer Gibson "if all this is necessary". According to Webb, Officer Gibson responded that "You're damn right this is necessary. You went in and vandalized Sheryl's apartment." Officer Gibson testified that Webb then stated, "But the stuff I damaged was mine too."

Webb argues that Officer Gibson's statement constituted interrogation because it was likely to elicit an incriminating response from him. We disagree. The fact that the statement was made after Webb invoked the right to counsel is not dispositive. Officer Gibson's statement not only was a reasonable response to Webb's inquiry, but it did not call for a response from Webb. Because Officer Gibson could not have known that his alleged statement would elicit an incriminating response from Webb, we hold that Webb's statement was not induced by improper custodial interrogation and thus was voluntary and properly admitted into evidence.

### III

Webb contends next that his alleged statement to Metcalf that he had a surprise waiting for her was improperly admitted into evidence because it was protected by the marital communications privilege.[2] RCW 5.60.060(1) provides, in pertinent part:

> [Neither may a husband nor a wife] during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage.

The marital communications privilege applies to confidential communications between spouses during marriage.[3]

---

[2] The marital communications privilege, which Webb invokes here, is distinguished from the marital *testimonial* privilege which immediately precedes it in RCW 5.60.060(1). The testimonial privilege prevents a spouse from being examined as a witness for or against the other spouse without the consent of the other spouse. RCW 5.60.060(1); *State v. Thorne*, 43 Wn.2d 47, 55, 260 P.2d 331 (1953).

[3] The communications privilege survives dissolution and death. *Thorne*, 43 Wn.2d at 56.

RCW 5.60.060(1); *State v. Thorne*, 43 Wn.2d 47, 55, 260 P.2d 331 (1953). To fall within the privilege, a communication must have been induced by the marriage relationship. *State v. Snyder*, 84 Wash. 485, 486, 147 P. 38 (1915); *accord, State v. Americk*, 42 Wn.2d 504, 506, 256 P.2d 278 (1953); *State v. Robbins*, 35 Wn.2d 389, 392-93, 213 P.2d 310 (1950); *State v. Moxley*, 6 Wn. App. 153, 158, 491 P.2d 1326 (1971), *review denied*, 80 Wn.2d 1004 (1972). The marital communications privilege is intended to encourage "that free interchange of confidences that is necessary for mutual understanding and trust." *Thorne*, 43 Wn.2d at 55. The privilege is based on the premise that "the greatest benefits will flow from the relationship only if the spouse who confides in the other can do so without the fear that at some later time what has been said will rise up to haunt the speaker." *Thorne*, 43 Wn.2d at 55.

RCW 5.60.060(1) also provides an exception to the privilege when the communication is offered in a "criminal action or proceeding for a crime committed by one [spouse] against the other". However, as the State concedes, Washington courts, consistent with the common law, have limited this exception to cases where the crime committed against the testifying spouse is one of personal violence. *See State v. Grasser*, 60 Wn.2d 343, 345-46, 374 P.2d 149 (1962); *State v. Kephart*, 56 Wash. 561, 562-64, 106 P. 165 (1910); *State v. Kilponen*, 47 Wn. App. 912, 915, 737 P.2d 1024, *review denied*, 109 Wn.2d 1019 (1987); *Moxley*, 6 Wn. App. at 158. Thus, the only issue presented here is whether Webb's alleged statement falls within the marital privilege itself.

Webb asserts that the marital communications privilege is applicable here because his alleged statement to Metcalf that he had a surprise waiting for her was a communication induced by the marriage relationship. The State contends that because the communication was a threat, it falls outside the marital communications privilege.

We note that it is uncontroverted that the alleged statement was made while Webb and Metcalf were separated

and after Metcalf had filed for dissolution of the marriage. Although an argument can be made that a threat made during a defunct marriage should not constitute a communication made in reliance on the marriage relationship,[4] our courts have taken the position that for purposes of the marital communications privilege, the marriage exists until terminated by dissolution. *See Grasser*, 343 Wn.2d at 345-46; *Moxley*, 6 Wn. App. at 158.

Similarly, one can legitimately question whether a threat by one spouse against the other spouse aimed at coercing the other spouse into complying with the will of the threatening spouse constitutes a communication made in reliance on the marriage relationship. *See, e.g., State v. Richards*, 182 W. Va. 664, 668-69, 391 S.E.2d 354, 358-59 (1990). However, there is authority to support a contrary view. *See Cavert v. State*, 158 Tenn. 531, 544, 14 S.W.2d 735, 739 (1929).

■ We need not resolve this question here because even if Webb's threat against Metcalf is characterized as a statement "induced by the marital relationship" and hence, protected by the marital communications privilege, we conclude that admission of his statement was harmless error. Error that is not of constitutional magnitude is harmless unless there is a reasonable probability, in light of the entire record, that the error materially affected the outcome of the trial. *State v. Thomas*, 110 Wn.2d 859, 862-63, 757 P.2d 512 (1988); *State v. Edwards*, 51 Wn. App. 763, 765, 755 P.2d 821 (1988). Here, the result would not have been different without this evidence.

Webb admitted that he entered Metcalf's apartment while she was out of town and damaged some property while inside. The nature of the damage, *i.e.*, a slashed mattress, pillow, quilt, and stuffed animals; strewn nail polish on the walls and furniture, confirmed that the damage was intentional. Webb's knife was found inside the apartment, and Webb admitted to Officer Gibson that the knife had last

---

[4]*See State v. Grasser*, 60 Wn.2d 343, 346-47, 374 P.2d 149 (1962) (Finley, C.J., dissenting).

been in his possession the night Metcalf's apartment was vandalized. Given the nature of the damage and the presence of Webb's knife in the apartment, Webb's claim that he inadvertently damaged some property in Metcalf's apartment is preposterous. Based on this evidence, we conclude that trial court's error, if any, in admitting Webb's alleged threat to Metcalf was harmless.

### IV

Webb's final contention is that he is not guilty as a matter of law of any damage to the property that was in community ownership because RCW 9A.48.080(1)(a) requires that the damage be to the "property of another".[5] Thus, Webb argues that the trial court erred in refusing to submit his proposed jury instruction which advised the jury on the definition of separate and community property and on each spouse's equivalent authority to dispose of community property.

Relying on *State v. Birch*, 36 Wn. App. 405, 675 P.2d 246 (1984), Webb asserts that the term "property of another" in RCW 9A.48.080(1)(a) refers exclusively to property *wholly* owned by another, thus excluding community property he co-owned with Metcalf at the time of the incident.

In *Birch*, the court held that partnership property did not constitute the "property of another" within the meaning of the theft statute notwithstanding statutory limitations on a partner's use of such property.[6] 36 Wn. App. at 410-11. The holding in *Birch* was based primarily upon the court's refusal to overrule *State v. Eberhart*, 106 Wash. 222, 225,

---

[5]RCW 9A.48.080(1) provides:

"A person is guilty of malicious mischief in the second degree if he knowingly and maliciously:

"(a) Causes physical damage to the property of another in an amount exceeding two hundred fifty dollars".

[6]RCW 9A.56.020 states in pertinent part:

"(1) 'Theft' means:

"(a) To wrongfully obtain or exert unauthorized control over *the property or services of another* or the value thereof, with intent to deprive him of such property or services; . . .".

179 P. 853 (1919), which held that a partner could not be prosecuted for use of partnership property because "[t]he title to partnership property cannot be said to be in another because each partner is the ultimate owner of an undivided interest in all the partnership property". The *Birch* court stated that any change to the rule in *Eberhart* was better left to the Legislature. *Birch*, 36 Wn. App. at 406.

However, since the *Birch* decision, the Legislature has made the theft of partnership property a crime. *See* RCW 9A.56.010(7)(c). Thus, *Birch* has been legislatively over-ruled. Moreover, although the Legislature has not criminal-ized *malicious damage* of community property, it has not criminalized *theft* of property co-owned by a defendant either. Yet, this has not prevented Washington courts from concluding that a defendant's ownership interest in the property stolen does not preclude a conviction for theft. In *State v. Pike*, 118 Wn.2d 585, 590, 826 P.2d 152 (1992), our Supreme Court held that the "property of another" element of theft consists of property in which another person has an interest and over which "the defendant may not lawfully exert control . . . absent the permission of that other per-son."

Here, Webb and Metcalf formally separated in early 1989. In February 1989, Webb moved out of the couple's apart-ment and gave his key to Metcalf. Metcalf and Webb divided their possessions and, at the end of April 1989, Metcalf removed Webb's possessions from the apartment. Thus, at the time of the incident in May 1989, it is apparent that Metcalf had the superior, if not sole, interest in the personal property in her possession. Thus, under *Pike*, because Webb's ownership interest in the damaged property was inferior to Metcalf's, his conviction for malicious mischief was not barred.

Furthermore, unlike theft, malicious mischief encom-passes the damaging, if not the destruction, of property, and therefore, possession can never be redeemed. Hence, sound policy reasons exist to treat the term "property of another" in the malicious mischief context differently than in the

theft context. Thus, we conclude that the term "property of another" as used in RCW 9A.48.080(1)(a) includes property co-owned by the defendant. *See People v. Kahanic*, 196 Cal. App. 3d 461, 464, 241 Cal. Rptr. 722, 725 (1987) (affirming spouse's conviction for vandalism for damaging property held in community ownership); 4 C. Torcia, *Wharton on Criminal Law* § 490, at 96 (14th ed. 1981) (property is deemed to be that of another if one other than the actor has any possessory or proprietary interest therein). Accordingly, Webb's proposed instruction was properly refused.

Finally, Webb challenges his sentence. The State concedes that the burglary and malicious mischief offenses should have been treated as constituting the same criminal conduct and counted as one crime for purposes of computing Webb's offender score. *See State v. Dunaway*, 109 Wn.2d 207, 217, 743 P.2d 1237, 749 P.2d 160 (1987).

We affirm Webb's conviction and remand his case for resentencing.

COLEMAN and BAKER, JJ., concur.

After modification, further reconsideration denied March 31, 1992.

Review denied at 119 Wn.2d 1015 (1992).