IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>                Appellant,<br><br>    v.<br><br>COY DALE BOZEMAN, JR.,<br><br>                Respondent. | No. 83055-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Coy Dale Bozeman, Jr. was convicted of three counts of child molestation in the first degree after a jury trial. Bozeman and his wife agreed to temporarily take in three young girls, then ages 10, 7 and 6, at the request of the girls' grandmother. The girls reported to their mother and grandmother that Bozeman had touched and rubbed their private areas. The defense theory of the case was that the girls wanted to return to their family and had fabricated the allegations against Bozeman after reading a journal describing unrelated child sexual abuse. The trial court excluded all testimony about the journals. On appeal, Bozeman challenges the exclusion of that evidence. Because the trial court abused its discretion in excluding the evidence and the error was not harmless, we reverse and remand for a new trial.

Citations and pincites are based on the Westlaw online version of the cited material

FACTS

In September 2018, Marlene Boulanger received a call from her son-in-law, Sean,[1] stating that Marlene's daughter, Sierra, had left him and their children and that he needed help.  Sean informed Marlene that Sierra, who had been using heroin, had left him for another man.  The couple and their four children, three daughters and one son, had been living in a small hotel room in Anacortes.  The hotel room was "in disarray" with no food and few clothes.  At the time, Marlene lived in a single-wide trailer with her husband, Tom, and two adult sons.  The home was too small to accommodate all four children.  Marlene reached out to a family friend, Coy Bozeman, and his wife, Denise, who lived in a three-bedroom house and ran a preschool the girls had previously attended to ask if they could help provide housing for the children.

At the time the girls moved in, the Bozeman home housed Coy, Denise, and 27-year-old Cheyenne Hopkins, whom Denise had fostered from age three to 10 or 11.  Denise and Coy were not married at the time Denise fostered Hopkins.  Denise reconnected with Hopkins in approximately 2013 after discovering that the then 19-year-old Hopkins was homeless and living in Oregon.  The Bozemans invited Hopkins to move in the same year.  Hopkins had previously experienced sexual abuse while in the foster care system unrelated to the Bozemans.  Hopkins had written detailed descriptions of the abuse in a journal she kept in the Bozeman house.

---

[1] We use first names for clarity when individuals have the same last name.  We also refer to the girls' parents by their first names to protect the identities of minor complaining witnesses.

The Bozemans agreed to temporarily take in the three girls, A.L., S.L., and Ar.L. The girls' older brother stayed with Marlene at her home. The three girls moved into the Bozeman house in October 2018. The Bozemans initially thought it would be only a few weeks or a month while the father obtained housing, which he never did.

Because of her experience seeing her own parents fostering kids and her own training as a foster parent, Denise was aware of protocols the adults could follow to protect everyone when the girls moved in. To protect themselves, the Bozemans and Hopkins agreed that Coy would never be alone with the girls. Because the house had two floors, with one floor containing the bedrooms and a bathroom used exclusively by the girls and Hopkins, they also agreed that Coy would not be in the upstairs portion of the house when any of the children were showering or changing. Denise had the same rules from when she fostered Hopkins. In addition to these rules, the Bozemans, Boulangers, and the girls' father agreed that they would not allow the children to have contact with their mother because of her drug use, believing it would be a motivating factor for the girls' mother to get into treatment.

Because of the girls' previous living situation, including the fact they came with a urine-soaked blanket, the Bozemans insisted to the Boulangers that the girls get counseling right away. Because the Boulangers did not know where to begin, Denise looked up a couple of places for the Boulangers to choose from. Boulangers chose Citizens Against Domestic Abuse (CADA) and the girls started seeing a counselor regularly a few weeks after moving into the Bozemans'.

3

For some time after the children moved in with the Bozemans, their father and grandparents arranged to see them most weekends. In November, the Bozemans discovered that Sean had been taking the girls to see their mother. Following that discovery, the Boulangers and Bozemans agreed that visits with Sean needed to be supervised. Following this agreement, Sean failed to contact the Bozemans or his daughters during the month of December. On Christmas day, the Boulangers arrived several hours late to the Bozemans, which delayed the girls opening some presents. After the holiday, A.L., the oldest, told Denise she wished her dad would have come or called. In early January, Boulangers returned the girls back to the Bozemans after a visit. While saying goodbye, the girls became upset and said they did not want to be left there and wanted to go home with their grandparents. When Marlene asked the oldest what was wrong, she said she was just sad and wanted to live with her grandparents.

The visits from the Boulangers became more sporadic. While the Bozemans stated that the Boulangers reached out less often, the Boulangers said the Bozemans were less available.

Marlene's concerns grew between January and April 2019, when she felt that the girls seemed "unhappy" and "like something was bothering them." Marlene stated that every time she saw the girls she would ask if everything was alright with the Bozemans, though the girls denied anything wrong. On a Saturday in April 2019, the three girls went to their grandparent's home with plans to spend the night there. During this visit, the Boulangers, their two adult sons, the girl's older brother, and their father were at the house. Marlene allowed

4

the girl's mother, Sierra, to come over and see the girls during this visit because she felt "bad" that Sierra had not seen the girls in several months. When Sierra arrived, she went to the living room to spend time with the girls. The Boulangers went to their bedroom at the back of the home. After roughly 20 minutes, Sierra came to the back bedroom and asked Marlene to come talk to the girls in the living room with her, saying the girls told her that the Bozemans were being "mean" to the girls and "picking on" S.L. Sierra told Marlene that she felt the girls were not telling her something. She did not mention sexual abuse when she came back to get Marlene.

Marlene accompanied Sierra back to the living room, where she found the three girls standing next to each other in a row and Sierra asked "is there anything else that you would like to tell me or grandma or both of us because grandma is here now." Marlene did not ask the girls any questions, but gave "assurances" that they would not be in trouble and could talk to her. S.L. then appeared "real nervous," began jumping up and down, and put her hands behind her back before saying "we'll tell you the truth." Marlene testified that the three girls did not go into much detail but told Marlene that Coy had "touched their private, rubbed it." The girls actually did not use a word to describe the area that was touched, but, instead, pointed in the direction of their vaginas. Marlene said the girls did not disclose a lot of detail because S.L. was pretty upset and that Marlene and Sierra did not ask for more details because they were going to call the police. They first spoke to Marlene's husband, Tom, who told them not to call the police. He said they needed to contact CADA and schedule an emergency

meeting that following Monday, which they did.

Marlene testified at trial, without objection, that after the girls met with a counselor at CADA, the counselor said that she believed the girls and that they should call the police.

A deputy from the Island County Sheriff's Office responded and scheduled an appointment for the office's dedicated child sexual assault detective to conduct forensic interviews with each of the girls that week. The girls individually gave video-recorded interviews with detective Chris Peabody. Each child reported several instances of Coy touching their "private area" while they lived in the Bozeman home.

On May 8, 2019, the State charged Coy with two counts of rape of a child in the first degree, in violation of RCW 9A.44.073, and two counts of child molestation in the first degree, in violation of RCW 9A.44.083. A jury trial took place in early 2021.

The State moved in limine to exclude Hopkins' journals.[2] Hopkins wrote the journals as part of her own therapy after a difficult childhood that included sexual abuse by at least one of her foster families. The journal included graphic descriptions of the sexual abuse she suffered, including a rape that occurred in a bathroom. The parties agreed that the contents of the journal do not involve anyone or any place at issue in the trial.

---

[2] Though the record indicates that the State and defense had a copy of the journals, the journals were never admitted and are not part of the record. Information relating to the contents of the journal is based on representations the prosecutor and defense counsel made to the court during motions in limine. The record shows that while both the State and defense reviewed the journals, the court did not.

The State argued that it understood the defense would like to argue that the girls found this journal, read it, and used it as a source material for made-up allegations; but that the journals were irrelevant because the allegations "are not similar in any real way to the allegations or disclosures made by the victims in this case." The State further argued that all three of the girls denied reading it. The State argued the journals were irrelevant, constituted hearsay, and could "only mislead or confuse the jury."

Bozeman's attorney countered that Hopkins would further testify that she had caught the girls going through her belongings, including her journals, and reading them. Also, Bozeman offered that testimony would establish that pages of the journals had been torn out and later found folded up and hidden in the girls' bedroom. Counsel argued that this was evidence that the girls read the journals and that they could have gotten some ideas from what they read, including molestation in the bathroom or touching between the legs. Counsel argued that this goes directly to its theory and that if Hopkins is the one testifying about her own writings and observations of the girls, then it should be admissible. The trial court then granted the State's motion in limine, finding the "journals written by Ms. Hopkins are irrelevant, likely to confuse, prejudice and mislead the jury, and are inadmissible hearsay."

The court then raised the question of whether the parties had addressed if Hopkins' could testify about the journals as opposed to the admission of the actual journals themselves.

7

The State argued it would be misleading and confusing to the jury if Hopkins were allowed to testify to "a whole laundry list of similar explicit events that the jury is going to have to be able to compartmentalize" and that the State would be asking for a limiting instruction that the testimony is solely relevant as to the issue of victims' credibility. The State argued this testimony should be excluded as misleading and confusing under ER 403.

The court responded, "As I understand, the only similarities to what happened to Ms. Hopkins and what happened – or allegedly happened to the children is that the location was the bathroom. And that's it. Is that correct?" Bozeman's counsel responded, "Yes, that would be the – main similarity." Defense counsel clarified that it would not be seeking to introduce the "intricate details" of what Hopkins experienced, but it is "relevant and it would be a question for the jury to be able to assist them in assessing the credibility of these girls to hear that . . . they could have been looking at or, according to Ms. Hopkins, did look at her journals including her history of sexual abuse." The trial court reserved ruling until after jury selection, but stated,

> I will tell you right now that the only similarity that appears to exist is that these instances either happened or alleged to have happened in a bathroom.
> But there's nothing, other than that, that makes the allegations – makes it more relevant than they – they read this and they decided to use the same type of abusive situation as something that happened to them.

No one re-raised the issue until the second day of trial when the court reminded the parties about the outstanding motion in limine. The court ruled

> I do not find that those – that the things that you have told me about what's in the notebook is relevant to what occurred in this

8

case other than the young girls are alleged to have been sexually
abused and Cheyenne was alleged to be sexually abused.

But the sexual abuse was different in that the only – the only
similar thing was that some of this occurred in a bathroom.

But I don't think that just that particular incident, that it
occurred in a bathroom, makes this relevant enough to get into
those issues.

At trial, the State played the girls' videotaped interviews with Peabody and the girls
also testified.

*A. A.L. testimony*

*(i) Bedroom incident*

In her interview with Peabody, A.L., the oldest, reported that Coy touched
her "in [her] sleep sometimes." A.L. reported that the touching first started a
couple of days after Christmas. She remembered wearing pajama pants she had
received as a Christmas gift. At the time, A.L. explained that she was sleeping in
the bottom bunk of a bunk bed in between both of her sisters. A.L. stated that
when she woke up she felt Coy's hand under her clothing in her "private area,"
which is the area she used to go "pee." A.L. said Coy used one hand and also
touched her breasts. She said this made her feel "worried and uncomfortable."
A.L. said her sisters never woke during the incident. A.L. stated that she woke
up to similar assaults "three to five times" and that all the other times occurred
when she slept by herself in the top bunk.

At trial, A.L. again described being woken up by heavy breathing and
feeling hands on her "private area," but was definitive at trial that this occurred on
Christmas night and this was the first time he touched her private area. Instead
of this occurring three to five times, A.L. said she thought it was two or three

times, and was pretty sure it was two. She did not remember it happening for another month.

*(ii) Hot tub incident*

In the interview with Peabody, A.L. described another incident that occurred in a hot tub after Denise had gotten out because it was too cold, leaving her and her younger sisters with just Coy. A.L. stated that Coy pulled her next to him in the hot tub, reached his arm around her and then put his hand under her bathing suit and "started to rub [her] in [her] private area."

At trial, A.L. testified that she did not remember talking to anyone about an incident in a hot tub. She remembered using the hot tub to bring down her temperature or something like that because she was overheating. She also remembered another time when she and her sisters were playing in the hot tub when Coy was sitting in it. Denise and Coy were first in the hot tub. At some point in time only Coy and the girls were inside the hot tub when Coy pulled A.L. over and touched her private parts, meaning the part where she uses the restroom. When asked if Coy touched her inside or outside of her bathing suit, A.L. said she did not exactly remember and that all she remembered is him touching her and feeling uncomfortable. Afterwards she moved away and started jumping off the edge with her sisters. A.L. said Denise and Hopkins were inside the house during this time. A.L. said Hopkins would occasionally come out to check on them, like when they were playing and jumping off the edge.

*(iii) Vicks incident*

In the interview with Peabody, A.L. reported that the night before they went to the Great Wolf Lodge, Denise was sick and A.L. was sick. A.L. said Coy would touch her "breasts rubbing Vicks" all over her, and that he also rubbed "Vicks" all over her sisters too. When asked what she meant by "all over," A.L. said "Like all on the br – front area here (indicating)[3] and in the back." She said that Coy did not tell her he would be touching her there while applying the Vick's. A.L. stated that the touching made her "uncomfortable."

At trial, A.L. testified that she and her sisters got to go to the Great Wolf Lodge to celebrate their birthdays, which were all around the same time. When asked if she remembered anything happening the day before they went to the Great Wolf Lodge, A.L. answered, "I don't remember anything that happened then before the Great Wolf Lodge. I'm going to say no." When A.L. was asked if Denise was sick and if A.L. had to get any kind of medicine or anything before going to the Great Wolf Lodge, A.L. said she thought she remembered Denise being sick and that she had been sick for a few days. When A.L. was specifically asked if she remembered talking to the detective about Vicks VapoRub, A.L. said she had to lift up her shirt and Coy would rub it all on her back and "like right below my chest and like right here." A.L. said Coy said it would help with her "fever and stuff," but she did not expect him to rub it all over her chest and

---

[3] Transcripts of the videotaped interviews are in the record, but the actual videotaped interviews were not designated for appeal though they were admitted at trial. Thus, whenever the transcripts refer to the girls indicating or gesturing, we are unable to determine the meaning beyond the context of the transcription.

stomach. A.L. said she remembers Denise being in the room and thought she was watching TV when Coy was applying the rub. When asked to describe specifically where Coy rubbed the Vicks, A.L. said her back, stomach and the quarter top of her chest. When asked specifically if she had breasts at the time, A.L. said, "Yes." When asked if Coy put the Vicks on her breasts, A.L. answered, "No. But . . ." Later, A.L. said it was "pretty close" to her breasts and indicated a location. A.L. said her sisters were there and had some put on their backs as well.

In the interview with Peabody, A.L. said she told her sisters about Coy touching her the day it happened. It is not clear from the record if A.L. was talking about the bedroom incident or the hot tub incident. A.L. said when she told her sisters, they told A.L. that Coy touched their private area too "when he was washing it" in the shower.

At the end of the interview with Peabody, A.L. voluntarily added, "when we were living at Coy and Denise's they – they were trying to separate us from our dad and our mom and grandma and grandpa." She said that the Bozemans did not respond to texts from her dad asking if he could see the girls on the weekends.

At trial, when asked if, before talking with her parents and grandparents, A.L. had talked to her sisters at all about any of the things that happened to her at the Bozeman house, A.L. said it was probably about a month before moving out of the Bozeman's house when she asked her sisters if they felt weird or if Coy had touched them and they said "yeah." A.L. said her sisters said one time

in the shower, Coy was washing them "like down there for them." They also told A.L. that Coy touched them in the hot tub as well.

When asked at trial how often A.L. would be left in a room with just Coy and no adults, A.L. said she did not remember being in a room with Coy alone.

*B. S.L. testimony*

*(i) Bathroom incident*

In the interview with Peabody, S.L., the middle sister, said that one time, Coy touched her where she goes "pee" while he was washing all of her body in the shower with soap. S.L. said Coy put his fingers inside her and it felt "[a]wkward." In the videotaped interview, S.L. reported that she went into the bathroom to take a shower after her younger sister, Ar.L., had finished showering and stated that Coy "was waiting for [S.L.] in the bathroom" and that he "started washing" her when she went into the bathroom. S.L. stated that Coy washed her whole body, including her "area." When asked what that meant, S.L. said she didn't "know really how to explain it" and pointed below the table. She explained that the area is used for "going to the bathroom" and to "pee."

At trial, S.L. testified that she did not remember a lot of the details of what had happened. S.L. said she was taking a shower when Coy came into the bathroom, opened the curtain, used his bare hand to touch her private area that is used for "peeing," and then left without saying a word. When asked if Coy put his fingers insider of her, she answered that they stayed outside of her.

*(ii) Hot tub incident*

In the interview with Peabody, S.L. said one time Denise got out of the hot tub because she was cold and the girls got in and started having fun. S.L. said Coy pulled her close and touched her private area over her bathing suit twice. S.L. said she saw Coy do the same thing to her sisters. At trial, S.L. testified that she remembered playing in the hot tub with her sisters, but could not remember if Coy touched her in a way that made her uncomfortable. S.L. testified that she did not think anything happened in the hot tub, but later clarified that her testimony is that she could not remember if anything happened.

*(iii) Vicks incident*

In the interview with Peabody, S.L. said one time they were getting ready to go to the Great Wolf Lodge and Denise was sick. S.L. said Coy told the girls to take off their pajama shirts and he put Vicks on them. S.L. said it was put on her feet and she indicated in the videotaped interview another location. S.L. said Coy overloaded A.L. with Vicks on her chest because she has breasts. S.L. clarified that she did not see this herself, but was told this by A.L. when the sisters exchanged stories about what Coy had done to them.

At trial, S.L. testified that she did not know what Vicks VapoRub is, but remembered having a goopy, smelly medicine rubbed on her. She could not remember if it was by Coy or Denise or both. She said it was rubbed on her back and on her chest near her neck. S.L. said she never talked to her sisters about getting medicine rubbed on their chests. She later clarified that she remembered A.L. telling her that Coy kept rubbing it at the same spot over and over.

14

*(iv) Lap incident*

In the interview with Peabody, S.L. said Coy once asked her to sit on his lap in the living room and when she did he put his hands in S.L.'s pajama pants and touched her privates. S.L. said her sisters were still eating dinner. S.L. said Denise was sitting in a chair in the same room looking at her iPad and watching TV when Coy "just put his hands in [her] pants and he took it out." She did not believe Denise could see what he was doing at that point.

Near the end of the interview, S.L. stated that she believed the Bozemans were thinking about adopting the three girls and said they could see their father, but not their mother.

At trial, S.L. testified that she did not think Coy did anything when she sat on his lap. She later clarified that she does not remember if anything happened while she sat on Coy's lap.

At trial, S.L. remembered overhearing her parents and grandparents talking about the Bozemans, but could not remember what was said. S.L. testified that she did not like to think about things that happened at the Bozemans' house because it made her nauseous. And when asked how it came about that S.L. started talking to her mom and grandmother about this topic, S.L. said, "Because me and my siblings were planning on telling them when we had a chance to spend the night, and then I finally got the confidence . . . and we told them." S.L. denied that the conversation began with anyone asking her questions. She said that she "just asked to talk to [her mother and grandmother]

privately." S.L. said she wanted to tell them with her sisters because her sisters had told her that Coy had touched them also.

*C. Ar.L. testimony*

*(i) Hot tub incident*

In the videotaped interview, Ar.L., the youngest of the sisters, also reported that Coy had touched her "private" while she was living at the Bozemans'. Ar.L. first described an incident in which she reported that Coy had touched her while in the hot tub. She stated that while she was in the hot tub, he told her to "come over" next to him, then reached his arm around her and touched her. Ar.L. said "he put his hand where my – where – where my pee-pee is" and "rubbed it there." She said this made her feel "uncomfortable."

At trial, Ar.L. remembered a hot tub at the Bozemans' house and being in the hot tub with her sisters. She thought Coy was there, did not think Hopkins was there, and did not know about Denise. Ar.L. could not remember anything beyond that.

*(ii) Bathroom incident*

In the interview with Peabody, Ar.L. also said she was taking a bath with a bath bomb[4] when Coy came in and washed her "private." Ar.L. said Coy put his fingers inside her privates and it hurt. Ar.L. said it only lasted a second.

At trial, Ar.L. thought she remembered using a bath bomb at the Bozemans but could not remember what happened when she used it.

---

[4] The presentence investigation report describes a bath bomb as "a hard-packed mixture of dry ingredients [which] effervesce when wet and add essential oils, scent, bubble, or color to the bath water."

*(iii) Vicks incident*

In the interview with Peabody, Ar.L. made no mention of the Great Wolf Lodge or Coy rubbing medicine on anyone. At trial, when specifically asked about the Great Wolf Lodge, Ar.L. remembered going there with her sisters and the Bozemans and Hopkins, but had no memory of whether Denise was sick before going to the lodge. Ar.L. testified that she was pretty sure A.L. was not sick and could not remember if she, herself was sick.

In the interview with Peabody, Ar.L. denied her sisters saying anything happening to them with Coy.

At trial, when explicitly asked if she remembered talking with her grandma and mom about Coy touching her in her private areas, Ar.L. said yes but could not remember what she told them. Ar.L. said she remembered both she and her sisters telling their mom and grandma that Coy touched their "privates," meaning the area used for "peeing."

After the State's case in chief, the prosecutor moved to amend the information to change the two counts of rape of a child in the first degree to child molestation in the first degree.

*D. Defense Witnesses*

The defense called Denise, Hopkins and Coy to testify. Denise testified that as a general safety matter, based on her own training as a former foster parent, everyone in the house agreed that Coy would never be alone with the girls or even on the same floor of the house when they showered. Both Denise

and Hopkins testified that Coy never helped with bath time. Hopkins would help the two youngest girls wash their hair in the showers.

Denise and Coy both testified that Coy sleeps with a CPAP machine.[5] On Christmas night 2018 he and Denise watched a movie, made calls to the family, watched the 11:00 p.m. weather news and went to bed. Coy denied ever touching any of the girls inappropriately.

They testified that the hot tub had been used as a cold tub to bring down the girls' fevers, and that they were allowed to play in the hot tub only one time. They testified that Coy and Denise were in the hot tub when the girls begged to get in. After Denise agreed, Hopkins helped the girls get into the hot tub. After the girls started splashing water, Denise's hair got soaked and she got out because she got cold. Hopkins testified that she remained next to the hot tub and even moved Coy's whiskey drink aside as the girls were jumping around, splashing and doing spins while Coy held onto the sides of the tub with both hands. Hopkins said she never saw Coy pull the girls to him. Hopkins testified that she could see what was going on the entire time the girls were in the hot tub and did not see Coy touch the girls.

Both Hopkins and Denise testified that right before going to Great Wolf Lodge, everyone was sick and running a fever, except for Coy. Denise said she grew up with her dad using Vicks VapoRub on her and considered it a common thing. Denise explained that, as a former professional firefighter, Coy was the

---

[5] A continuous positive airway pressure (CPAP) machine is used to keep the user's airway open while sleeping and are often used to treat sleep apnea or other breathing disorders.

go-to person in their family when people were sick. She witnessed Coy put Vicks on the girls, using gloves and applying the rub on their feet, their backs, and straight down their chests and underneath the ribs. Hopkins testified that the girls did not like the sliminess of the Vicks. Coy also testified that he explained to the girls about the Vicks and used gloves to put it on from their chin straight down the sternum, lower rib cage, full back of their ribcage and their feet.

Denise testified that everyone had their regular places where they sat in the living room and it would be exceptional for Coy to invite one of the girls to sit on his lap, which never happened. Denise said she gave the girls bath bombs as a Christmas gift and when she let Ar.L. use hers, she believed Coy was not even home. Coy denied ever having the girls sit on his lap. Coy testified that he never helped with bath time, would not even be upstairs during bath time, and did not even know what a bath bomb was until after he was arrested.

At the conclusion of the six-day jury trial, the jury returned a verdict of guilty on all counts. Bozeman was determined to be subject to indeterminate sex offender sentencing and the court imposed a term of imprisonment of 98 months to life followed by community custody.

Bozeman appeals.

## DISCUSSION

Bozeman challenges the exclusion of the "journal entry evidence" and the trial court's ruling that the evidence was not "relevant enough." Thus, it appears Bozeman's appeal challenges the exclusion of Hopkins' testimony about the journals and not the exclusion of the journals themselves. Bozeman first argues

that the trial court violated his right to present a defense pursuant to the Sixth Amendment and article 1, section 22 of the Washington Constitution.

The Sixth Amendment to the United States Constitution guarantees a defendant's right to compulsory process and to confront the witnesses against him or her. U.S. CONST. amend. VI; CONST. art. 1, § 22. "Courts and litigants often refer to these rights, collectively, as the 'right to present a defense.'" State v. Bedada, No. 79036-6-I, slip op. at 6 n.2 (Wash. Ct. App. May 11, 2020), https://www.courts.wa.gov/opinions/pdf/790366.pdf.

Evidentiary rulings alleged to have violated a defendant's constitutional "right to present a defense" are reviewed in a two-step process. State v. Arndt, 194 Wn. 2d 784, 797-98, 453 P.3d 696 (2019). First, the court should analyze the evidentiary rulings for abuse of discretion. Id. at 798-812. When no abuse of discretion is found, the court then reviews de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Id. at 797. The Washington State Supreme Court recently clarified that not every application of the Arndt test requires both evidentiary and constitutional analyses. State v. Jennings, 199 Wn. 2d 53, 59, 502 P.3d 1255 (2022). Constitutional analysis is only required where an abuse of discretion constituted harmless error or where the trial court did not abuse its discretion. Id. at 59 (citing State v. Jennings, 14 Wn. App. 2d 779, 800-01, 474 P.3d 599 (2020) (Melnick, J., concurring)). Where the trial court did abuse discretion in an evidentiary ruling and the ruling was prejudicial to the defendant, "we would avoid the constitutional issue altogether." Id.

Trial courts determine whether evidence is relevant and admissible, and appellate courts review the trial court's rulings for abuse of discretion. Id. at 59 (citing State v. Brockrob, 159 Wn.2d 311, 348, 150 P.3d 59 (2006)). A trial court abuses its discretion if "no reasonable person would take the view adopted by the trial court." State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001) (quoting State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998)).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "Generally, any circumstance is admissible which reasonably tends to establish the theory of the party offering it, to explain, qualify or disprove the testimony of his adversary." State v. Young, 48 Wn. App. 406, 410, 739 P.2d 1170, 1173 (1987). The "threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

The State argues that the journals had no tendency to make the existence of any fact of consequence more or less probable, and thus, have no probative value. However, even below, the State acknowledged that the defense would like to argue that the girls found the journal, read it, and used it as source material for made-up allegations. We reject the State's argument on appeal that there is no probative value.

The trial court acknowledged that a similarity was that the journals included sexual abuse that occurred in a bathroom. The court then ruled that it

did not think that made the evidence "relevant enough" to admit the testimony for that purpose. Thus, it does not appear the trial court excluded Hopkins' testimony as to the journals because they were not relevant. However, it is not altogether clear if the trial court's observation related to the weight of the evidence or a short-handed reference to the balancing test under ER 403.

Generally, ER 403 states "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." When applying ER 403, the burden is on the party seeking to exclude the evidence. Carson v. Fine, 123 Wn.2d 206, 225, 867 P.2d 610 (1994).

The State next argues that even if the evidence was minimally relevant, its admission would have introduced significant confusion by adding Hopkins' "entire history of rape and molestation as a child." Even with contents fully described, the State argues, the jury could easily have conflated the abuses suffered by Hopkins with the disclosures made by A.L., S.L., and Ar.L. Ironically, to support excluding the evidence, the State during motions in limine argued both that the allegations in the journal were "not similar in any real way to the allegations or disclosures made by the victims in this case" and also that they include a "laundry list of similar explicit events."

As Bozeman argued to the trial court, it had no intention of introducing intricate details of what Hopkins experienced. Because of the trial court's ruling, the parties never explored further exactly how the information about the journal

22

would be admitted.  Even the State below originally only moved to exclude the actual journals and not testimony about the journals.  And once the court inquired as to the question of Hopkins' testimony about the journal, the State said in that circumstance, the State would be asking for a limiting instruction that the testimony is solely relevant as to the issue of victims' credibility.

It is not enough that the evidence may be confusing for the jury, that risk of confusion must substantially outweigh the probative value of the evidence. That balancing considers how probative the evidence is to the defense.  "The balance may be tipped towards admissibility either because the evidence is highly probative or because the counterbalancing undesirable characteristics are minimal. The balance may be tipped towards exclusion either because the evidence is of minimal probative value (regardless of undesirable characteristics) or because its undesirable characteristics are so pronounced that they outweigh the probative value of the evidence."  5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 403.2 at 433 (6th ed. 2016).  see also Carson, 123 Wn.2d at 224-25 (recognizing that it is "unthinkable that a trial court would decline to admit evidence probative of the central issue in a case based solely on the witness' profession, the manner in which the witness dresses or on whether the court believes that the jury may think that the witness owes either party some obligation or loyalty"); Young, 48 Wn. App. at 413 (holding that the proffered evidence that was "highly probative" and "crucial" to defendant's theory of the case was not substantially out-weighed by the dangers enumerated in ER 403).

The evidence at issue was not just challenging the credibility of a witness, it was challenging the credibility of the accusers. Bozeman's only theory of the case was that A.L., S.L., and Ar.L., fabricated the allegations against him because they wanted to return home to their family. The journals were central to Bozeman establishing how such young girls could have the knowledge to claim inappropriate sexual contact.

Had Hopkins been allowed to testify as presented by Bozeman, he would have been able to argue that the girls wanted to leave the Bozemans' and return to their family, that they found Hopkins journal and read about how a child was sexually abused in a bathroom and touched between the legs, and how that provided the source to their allegations. Without that evidence, the jury was left to make an inference that the young girls gained their sexual knowledge from interactions with Coy.

By excluding the admissibility of the actual journals, the trial court already reduced the risk that the jury could confuse the abuse described in Hopkins' journal entries with the girls' allegations. The State did not meet its burden before the trial court in establishing that the dangers of confusion substantially outweighed the probative value of Hopkins' testimony about the journals.

We hold that the trial court abused its discretion in excluding Hopkins' testimony about the journals.

<u>Harmless Error</u>

Because we hold that the trial court abused its discretion in excluding Hopkins' testimony about the journals under ER 403, we apply the non-

24

constitutional harmless error standard to determine whether the trial court's evidentiary error was harmless. State v. Barry, 183 Wn.2d 297, 303, 352 P.3d 161 (2015); Jennings, 199 Wn.2d at 59 (holding that a court avoids the constitutional question of inability to present a defense, when a trial court abuses its discretion in an evidentiary ruling and the ruling was prejudicial to the defendant). We hold that the error was not harmless.

Non-constitutional error "is harmless unless there is a reasonable probability, in light of the entire record, that the error materially affected the outcome of the trial." State v. Webb, 64 Wn. App. 480, 488, 824 P.2d 1257; accord State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). An evidentiary error which is not of constitutional magnitude requires reversal only if the error, within reasonable probability, materially affected the outcome. State v. Halstien, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Chavez, 76 Wn. App. 293, 298, 884 P.2d 624 (1994) (quoting United States v. Bagley, 473 U.S. 667, 682, 106 S. Ct. 3375, 87 L. Ed. 2d 401 (1985)).

Here, the entirety of the State's case rested on the credibility of the three girls, A.L., S.L., and Ar.L. There was no physical evidence other than their testimony to support the charges against Bozeman. The girls gave inconsistent testimony as to whether they served as eyewitnesses to each other's incidents of inappropriate touching. The girls also explained that they told each other about these incidents and discussed them prior to reporting it to their mother and grandmother. S.L. also testified that the girls had planned to tell their mom and

grandmother about these allegations and wanted to wait until their next overnight to do so. When the opportunity presented itself, according to S.L., they asked to speak with both their mother and grandmother privately. When the mother returned to the girls with their grandmother, the girls were standing next to each other in a row ready to disclose. Both A.L. and S.L. stated in their forensic interviews that they believed the Bozemans were trying to separate them from their family.

The most detailed descriptions of the inappropriate touching were given in the interview with Peabody, not long after the girls moved out of the Bozemans, where Hopkins lived and where she had reportedly caught the girls reading Hopkins' journal that included graphic details about her own child sexual abuse, which included a rape in a bathroom. At trial, each of the girls testified to facts substantially different than those they initially provided to police in their forensic interviews. Both S.L. and Ar.L. claimed on the witness stand to not remember entire incidents of sexual abuse that they had previously claimed were conducted by Bozeman and described in detail.

Throughout this case, Bozeman maintained his innocence. He presented witnesses, including himself, who provided testimony that contradicted that of the three girls. Denise testified that he had never been left alone with the girls and that the family followed strict rules to protect both themselves and the girls from any abuse or allegations. Hopkins also testified about the rules, how the family strictly adhered to them, and her observations in the home. Both Denise and Hopkins testified that Bozeman had never been left alone with the girls and that

26

he never helped bathe them. The family had a rule that Bozeman would not even be on the same floor of the house when the girls were showering or changing. Hopkins also testified that she was present the entire time the girls were in the hot tub with Bozeman and could see into the hot tub. She stated that she never saw Bozeman touch the girls at all during that time and had his hands on the sides of the tub holding on while they splashed around in the tub. Hopkins and Denise were present for the application of Vick's VapoRub to the children and stated they did not witness any inappropriate touching while Bozeman applied it to the girls. Bozeman himself also took the stand and denied all of the accusations of inappropriate touching against him. His admitted applying the Vick's rub to the girls when they were sick but denied rubbing anyone's breasts while doing so.

The State's case relied solely on the credibility of the three girls. We conclude that, had the jury been able to hear testimony that the girls found and read Hopkins' journals describing child sexual abuse in detail, there is a reasonable probability that the outcome of the trial would have been affected.

We conclude that the trial court abused its discretion in excluding Hopkins'

testimony about the journal because it was not "relevant enough," and hold that the error was not harmless.  We reverse and remand for a new trial.[6]

_Coburn, J._

WE CONCUR:

_Díaz, J._

_Bowman, J._

---

[6] Because we reverse the convictions and remand for a new trial, we need not address other issues raised.