IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

STATE OF WASHINGTON,

Respondent,

v.

WARREN EUGENE BELL, JR.,

Appellant.

No. 83378-2-I

CORRECTED ORDER
GRANTING MOTION
FOR RECONSIDERATION IN PART,
WITHDRAWING OPINION,
AND SUBSTITUTING OPINION

Appellant, Warren Bell, moved for reconsideration of the unpublished opinion filed on August 7, 2023. The court has determined that appellant's motion for reconsideration should be granted in part, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the appellant's motion for reconsideration is granted in part; and it is further

ORDERED that the unpublished opinion filed on August 7, 2023, is withdrawn; and it is further

ORDERED that a substitute unpublished opinion be filed.

_____
Coburn, J.

_____
Chung, J.

_____
Dwyer, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83378-2-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WARREN EUGENE BELL, JR., | |
| Appellant. | |

COBURN, J. — Warren Eugene Bell, Jr. was convicted of felony murder in the second degree by a jury after he assaulted 71-year-old Joseph Alexander, resulting in Alexander's death. Bell argued self-defense at trial. Bell now presents several issues on appeal: whether voir dire conducted by videoconference technology was proper; whether the charging document was deficient; whether the jury instruction defining "participant" was a directed verdict and judicial comment on the evidence; whether the court improperly gave a first aggressor instruction; and whether the trial court improperly sustained a prosecutor's objection during closing argument. Bell also requests resentencing claiming that the trial court calculated Bell's offender score based on two convictions that constituted the same criminal conduct; a prior conviction of a crime that has been found to be unconstitutional, and an offender score of 12.5. Bell also submitted a statement of additional grounds, including whether his attorney was

Citations and pincites are based on the Westlaw online version of the cited material.

ineffective for agreeing to a stipulation instead of recalling a witness for rebuttal testimony.

Bell waived any claim based on convictions that constituted same criminal conduct. And though trial courts are required to round down offender scores, because the error did not change Bell's standard range, that error alone does not support remand. However, we remand for the trial court to strike the Victim Penalty Assessment (VPA) under RCW 7.68.035(4). Because Bell does not establish a basis for relief on his remaining claims, we otherwise affirm.

## FACTS

On August 21, 2020, Warren Eugene Bell, Jr., then 42 years old, was staying with his wife's mother, Brenda Steinmeyer, and her 71-year-old partner, Joe Alexander, at their home in Burien, as he commonly did. Brenda's brother, Donnie Steinmeyer, also lived at the home. Bell asked to borrow his mother-in-law's phone so he could call his wife. Bell took the phone to the front yard to make the call. Sometime later, Brenda[1] asked Alexander to get the phone back from Bell.

Donnie, who was watching TV upstairs, heard Bell and Alexander yelling at each other. Donnie went downstairs to investigate and Bell met him on the staircase. Alexander was somewhere near the bottom of the staircase as well. Bell was yelling and then punched Donnie. Bell turned back to go down the stairs as Alexander asked what Bell was doing. Bell exited the front door and walked into the front yard. Alexander followed him outside and asked Bell to return Brenda's phone. Bell then "slammed" the phone on the ground outside. Donnie stayed at the front door to the

---

[1] Because multiple people share the same last name, we use first names for clarity.

2

house, where he had a view of the entire front yard.

The two men continued into the front yard, where Donnie saw Bell hit Alexander, "knock[ing] him down" to the ground. Once Alexander was on the ground, Bell stood over him and continued to punch him "hard" with a "closed hand fist." Donnie estimates that Bell hit Alexander "about 10 times." Brenda came to the front door as Bell was already hitting Alexander. Donnie handed her his phone and instructed her to call 911. Donnie yelled out to Bell that Donnie would call the police and Bell stopped hitting Alexander. Bell then fled the scene, running down the street. Donnie never saw Alexander touch or strike Bell during the entire altercation. Donnie only saw Alexander "fall to the ground" after Bell knocked him down and kept punching.

During the altercation, one neighbor heard Bell and Alexander yelling for about a minute and then sounds of someone getting punched or hit and a thud. Other neighbors, including Timothy Gouran, saw Bell and Alexander yelling in the front yard, which caused concern. By the time neighbors responded, Bell was running up the street and a "seriously" injured Alexander was on the ground and not moving. None of the neighbors were in a position to actually see the physical contact between Bell and Alexander.

While a neighbor administered CPR, Alexander "did not look good," with significant swelling around his jaw, which looked like it had "shifted," blood, and his eyes rolled back in his head. Alexander's breathing was "gasping," "gurgled," and erratic. Alexander's dentures were found in the yard near the location of the assault.

Medics arrived and found Alexander unconscious and unresponsive. They determined Alexander was in critical condition and transported him to Harborview

3

Medical Center, where they routinely take "serious" traumas. Alexander remained unconscious in the hospital until he died on September 1, 2020. An autopsy determined that Alexander died as the result of blunt force injuries to the head. Alexander had significant contusions and abrasions on his face and head as well as multiple areas of hemorrhaging in his brain and surrounding tissue at the time of his death.

Shortly after the incident, Bell called his wife who had arrived on scene. She handed the phone to a detective who told Bell he would like to hear his side of the story. Bell responded with an expletive laden tirade, stating "Fuck you, bitch . . . I will kill you bitches . . . You're gonna have to kill me before I go to jail" before hanging up. Sergeant Pavlovich attempted to call Bell back, but Bell hung up several times. Bell was eventually taken into custody when he was found a week later. The State amended the charge of assault in the first degree against Bell to felony murder in the second degree after Alexander died

Trial was held in July and August of 2021. Bell testified at trial claiming self-defense. According to Bell, he "popped" Donnie upstairs after Donnie smirked about something in the news. As he exited the front door, Alexander asked Bell to return Brenda's phone so Bell "tossed" it back to him. The phone slipped out of his hand and fell, causing the battery to fall out. Alexander followed him outside and asked "goddamn it, Warren, why the fuck you do that for?" Bell said he turned to respond and Alexander was "up on [him]" and punched Bell in the face. Bell responded by hitting Alexander in the face. Alexander then "ducked his head and rushed" Bell. They both fell to the ground and Bell attempted to push Alexander off. Bell claims that Alexander was pulling on his arm, keeping him on the ground, and kicked Bell in the head at the same

4

time.  Bell "jabbed [Alexander] in the face again."  Bell says Alexander continued to hold onto his arm until Bell hit him in the jaw again and was able to extract himself.  Bell said at that point Alexander "wasn't doing very much" and Bell "took off."  Additional facts are discussed in the relevant sections below.

The jury convicted Bell of felony murder in the second degree.  Bell was subsequently sentenced to 397 months' confinement and 36 months' community custody supervision.

Bell appeals.

DISCUSSION

Remote Voir Dire Authority

Bell argues that King County Superior Court was not authorized to hold voir dire remotely under the statutes and court rules governing jury selection.

Trial courts have discretion in determining how best to conduct voir dire.  State v. Davis, 141 Wn.2d 798, 825, 10 P.3d 977 (2000).  A trial court's decisions about how to conduct voir dire are subject to an abuse of discretion standard.  Id. at 826.  "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons."  State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).  This court has recently upheld King County Superior Court's authority to hold voir dire remotely at a time when the Washington Supreme Court issued relevant emergency rules in response to the COVID-19 pandemic.  State v. Wade, No. 82910-6-I, slip op. at 14 (Wash. Ct. App. July 17, 2023), www.courts.wa.gov/opinions/pdf/829106.pdf.  We follow our holding in Wade and reject Bell's claim that the trial court conducted voir dire via videoconferencing technology

without authority.

Fair Cross Section

Bell next argues that the use of remote videoconference technology for voir dire violated his right to a jury selected from a fair cross section of the community. Bell argues that by holding voir dire remotely, the court required potential jurors to have internet access and video technology, which unconstitutionally prevented low-income jurors from participating.

Superior courts are required to compile a "jury source list" from a list of all registered voters, licensed drivers, and identicard holders in the county. RCW 2.36.055. From that, the superior court compiles a "master jury list," which is the "list of prospective jurors from which jurors summoned to serve will be randomly selected." RCW 2.36.055; RCW 2.36.010(12). The statute requires those selected for jury service to be "selected at random from a fair cross section of the population of the area served by the court." RCW 2.36.080(1).

The Sixth Amendment and article I, sections 21 and 22 of the Washington Constitution both guarantee a defendant's right to a jury trial. U.S. CONST. amend. VI. This right includes "the right to have a jury drawn from a fair cross-section of the community." State v. Meza, 22 Wn. App. 2d. 514, 533, 512 P.3d 608 (citing Taylor v. Louisiana, 419 U.S. 522, 530-31, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)), review denied, 200 Wn.2d 1021, 520 P.3d 978 (2022). The purpose of this requirement is that the jury cannot serve its function "'to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and . . . professional or perhaps

overconditioned or biased response of a judge'" if "'distinctive groups are excluded from the pool.'" In re Pers. Restraint of Yates, 177 Wn.2d 1, 19, 296 P.3d 872 (2013) (alteration in original) (quoting Taylor 419 U.S. at 530-31).

In accord with the conditions provided by Taylor, "States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." Id. (quoting Taylor, 419 U.S. at 537-38). A defendant is not, however, "'entitled to exact cross-representation in the jury pool, nor need the jury selected for his trial be of any particular composition.'" State v. McKnight, 25 Wn. App. 2d 142, 522 P.3d 1013 (quoting State v. Hilliard, 89 Wn.2d 430, 442, 573 P.2d 22 (1977)), review denied, 1 Wn.3d 1011, 528 P.3d 363 (2023). "We have never invoked the fair-cross-section principle . . . to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." Id. (citing Lockhart v. McCree, 476 U.S. 162, 173, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986)).

To establish a prima facie violation of the fair cross section requirement, the defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Meza, 22 Wn. App. 2d. at 533 (quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)).

Bell fails to show that any group of jurors was excluded from the master jury list or that the trial court excluded jurors simply because they either did not have access to or were not comfortable using videoconferencing technology.

After Bell filed a motion opposing the use of Zoom to conduct voir dire, the trial court filed an order denying that motion and providing further clarification on the procedures by which the trial court would conduct voir dire by videoconference technology. The trial court explained that the juror questionnaire would be sent to every potential juror and would include questions about the juror's access to Zoom-capable technology and the juror's comfort with using that technology. The order further stated that the court does not exclude jurors for the sole reason of lack of access to videoconference technology. The order explained that for jurors who either could not access or were not comfortable using that technology, the court would arrange times for small groups to appear at the courthouse for voir dire in person and in a socially distant room. The order also noted that the trial court would address other equity concerns by arranging for potential jurors who wished to appear in person to have free parking, free transit, and masks provided by the court. In fact, 10 jurors did appear in person at the courthouse and participated in voir dire.

We hold that Bell has failed to make a prima facie case for violation of his right to a jury from a fair cross section of the community.

## Right to a Fair Trial

Bell next argues that by allowing jurors to appear remotely by videoconferencing for voir dire, his right to a fair trial was violated because he was unable to assess the prospective juror's nonverbal conduct for signs of bias.

Defendants have a right to an impartial jury under both the Washington and United States constitutions. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. Where the court or parties detect bias in a potential juror, they can be removed "for cause." RCW 4.44.190. To examine potential bias, the parties ask questions of and engage in discussion with potential jurors during voir dire. State v. Momah, 167 Wn.2d 140, 152, 217 P.3d 321 (2009). The parties and court rely on all modes by which one person may assess another's credibility, including their demeanor, not strictly their answers to the questions. Uttecht v. Brown, 551 U.S. 1, 2, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007). Although the right to a fair trial is of the utmost importance in evaluating the voir dire procedures, and it is a "necessity that parties be able to ascertain bias," courts have been required to emphasize the countervailing need to provide for the safety of all participants in the midst of a pandemic. United States v. Thompson, 543 F. Supp. 3d 1156, 1164 (D.N.M. 2021) (defendant's "ability to ask questions during voir dire and to see the upper half of prospective jurors' faces is enough to satisfy his constitutional rights during jury selection, at least during an ongoing global pandemic"). This court has applied an abuse of discretion standard to trial court decisions concerning the manner of jury selection. State v. Bell, No. 83387-1-I, slip op. at 11 (Wash. Ct. App. May 22, 2023), https://www.courts.wa.gov/opinions/pdf/833871%20orderandopinion .pdf.[2]

This court recently held that a trial court did not err in denying a defendant's request that jurors wear clear face shields rather than opaque face masks to allow for observation of a juror's demeanor. Id. In Bell, the defendant argued that by covering

---

[2] The defendant in that case, Justin Dominic Bell, is not the same defendant in this case.

9

the lower portion of a juror's face with a mask, he could not view the juror's entire face, thereby interfering with his right to select an impartial jury.  Id. at 13.  The Bell court noted that

> Even under normal circumstances, without a global contagion and the face masking it requires, significant variations exist in trial court jury selection.  Some courtrooms place counsel and parties farther away from juries or at an angle, less able to see the nuances of their expression or hear the subtleties of their inflection.  Some jurors are more or less hidden within jury boxes.  Time for questioning and availability of questionnaires differs courtroom to courtroom and case to case.

Id. at 14.  Although, in the instant case, Bell may not have been able to see the entire bodies of the jurors in order to evaluate their demeanor during voir dire, he was presumably able to view their entire faces and to observe their facial expressions and body language above the shoulders while they responded to questions.  Beyond a general conclusory claim, Bell does not cite to the record to establish how he was unable to assess juror's nonverbal signs of bias and how it prevented him from receiving a fair trial.

We decline to consider this issue because Bell failed to cite to the record or advance any argument beyond a conclusory general claim.  See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by reference to the record or citation to authority will not be considered).

<u>Charging Document</u>

Bell next challenges the information charging him with felony murder in the second degree, arguing that it was constitutionally defective because it failed to include the elements of the predicate offense of assault in the second degree or cite the

10

relevant statute.[3] Bell also argues that the information failed to identify the means allegedly used to carry out the predicate felony where the statute provides multiple means of committing it.

The accused has a right to be informed of the criminal charges against him in order to facilitate the preparation of an adequate defense. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. To satisfy this right, the defendant must be provided a charging document setting forth every material element of the charge or charges against him, along with all essential supporting facts. State v. McCarty, 140 Wn.2d 420, 425, 998 P.2d 296 (2000). The standard of review applied is determined by the time at which the sufficiency challenge was made. State v. Taylor, 140 Wn.2d 229, 237, 996 P.2d 571 (2000). If the defendant challenges the charging document before a verdict is rendered, the charging language must be strictly construed. Id. If the defendant brings the challenge for the first time on appeal, the document must be liberally construed in favor of validity. Id.

Bell challenged the charging document prior to the verdict in his trial. As a result, we apply the two-prong test set out in State v. Kjorsvik, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991). If a charging document is found to be insufficient, the remedy is reversal and dismissal of the charges without prejudice. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008).

Bell was charged by information, which alleged

Count 1: Murder in the Second Degree

That the defendant Warren Eugene Bell, Jr, in King County, Washington, on or about August 21, 2020, while committing and

---

[3] Bell asserts an identical argument in his statement of additional grounds so we need not address that claim separately.

attempting to commit the crime of Assault in the Second Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death on or about September 1, 2020, of Joseph Alexander, a human being, who was not a participant in the crime;

Contrary to RCW 9A.32.050(1)(b), and against the peace and dignity of the State of Washington.

Bell first argues that the charging document is insufficient because, while it states that the predicate offense is assault in the second degree, it fails to cite to the relevant statute, RCW 9A.36.021. Thus, Bell claims, it "does not notify Mr. Bell of the predicate offense." Bell relies on State v. Pry to assert that "even where a statute is cited, naming an offense is insufficient to notify the defendant of the crime." 194 Wn.2d 745, 757, 452 P.3d 536 (2019). However, in Pry, the information charging the defendant with rendering criminal assistance was insufficient not for failing to include a citation to the statute outlining a predicate offense, but for failing to include an essential element of the offense charged as required by Washington State Supreme Court precedent. Pry, 194 Wn.2d at 757 (citing State v. Budik, 173 Wn.2d 727, 735-37, 272 P.3d 816 (2012)). Moreover, CrR 2.1 provides that the "information shall state for *each count* the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated." CrR 2.1(a)(1) (emphasis added). Bell was not charged with assault in the second degree, nor was assault in the second degree a "count" listed in the charging information. Bell cites no authority requiring the information to include a citation to the statute codifying the predicate offense. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

12

Washington courts have long held that while a predicate offense is an element of a felony murder charge, the information is not required to include the elements of the predicate offense itself. State v. Kosewicz, 174 Wn.2d 683, 692-93, 278 P.3d 184 (2012). This is because the defendant is not "actually charged" with the predicate crime, the predicate offense just substitutes the mens rea the State is otherwise required to prove. Id. at 692 (citing State v. Craig, 82 Wn.2d 777, 781, 514 P.2d 151 (1973)).

Bell argues that this court should instead apply federal law to this challenge. The Ninth Circuit has held that an information charging felony murder in the second degree "failed to serve the function that the law intended it to, namely, providing [the defendant] with adequate notice of the charges against him so as to enable him to prepare his defense" where the information did not specify which of the seven statutory means of assault in the second degree the defendant committed as a predicate felony to felony murder. Kreck v. Spalding, 721 F.2d 1229, 1232 (1983). This court has previously rejected Bell's argument. In State v. Hartz, this court concluded that neither article 1, section 22 of the Washington Constitution, nor the Sixth Amendment or principles of federal due process requires the State to list the elements of a predicate crime in a felony murder information. 65 Wn. App. 351, 353-54, 828 P.2d 618 (1992).

In keeping with existing caselaw, we reject Bell's argument that the charging document was required to include citation to and elements for assault in the second degree, the predicate offense to Bell's charge of felony murder in the second degree. The charging document was not constitutionally defective.

13

Instruction Defining "Participant"

Whether legal error in jury instructions could have misled the jury is a question of law, which we review de novo.  State v. Montgomery, 163 Wn.2d 577, 597, 183 P.3d 267, 277 (2008).

The trial court instructed the jury that in order to convict Bell, the State had to prove beyond a reasonable doubt, among other elements, that Alexander was not a participant in the crime of assault in the second degree.  The court's instructions included a definition of "participant" for the charge of felony murder.

> A "participant" in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice.  A victim of a crime is not a "participant" in that crime.

The instruction followed the standard Washington Pattern Jury Instruction, 26.04.01.  11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 241 (3d ed. 2008).

"A person is guilty of murder in the second degree when he or she commits or attempts to commit any felony, including assault . . . and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants."  RCW 9A.32.050(1)(b).  Though the statute does not define the term "participant," this court has defined the term, with approval of the Washington State Supreme Court.  See State v. Toomey, 38 Wn. App. 831, 840, 690 P.2d 1175 (1984); State v. Carter, 154 Wn.2d 71, 79, 190 P.3d 823 (2005).  In Toomey, this court held that in the context of the felony murder statute, "and by dictionary definition, ["participant"] obviously means another person involved in the crime – i.e. another principal or accomplice."  38 Wn. App. at

14

840. The Washington State Supreme Court explicitly approved of this definition, further explaining "it is clear that a participant must either be a principal (i.e., one who actually participates directly in the commission of the crime) or an accomplice (i.e., one who meets the statutory definition of accomplice)." Carter, 154 Wn.2d at 79 (citing Toomey, 38 Wn. App. at 840).

Bell objected to the court's instruction defining "participant." He argues that the instruction removed the State's burden and, under the facts of the case, directed a verdict on an essential element that Alexander was the victim. Bell argues that Alexander started the altercation by hitting Bell first, and, thus, Alexander was a "participant" in the fight. However, this court has previously held that even where the deceased started a fight leading to his death, the deceased was not a "principal or accomplice" in the assault predicating felony murder. See State v. Brigham, 52 Wn. App. 208, 210, 758 P.2d 559 (1988). In Brigham, the defendant and Bluford "engaged in an escalating physical conflict," where Bluford had been the aggressor "until Brigham pulled out a knife and stabbed him to death." Id. at 209. The court explained that the deceased could not have been a "participant" because "[n]othing in the record indicates he helped to stab himself, or solicited, commanded, encouraged, or requested Brigham to do so." Id. at 210 (citing Former RCW 9A.08.020(3) (1975)).

Moreover, the challenged instruction in the instant case did not prevent the jury from accepting or rejecting Bell's claim of self-defense. The jury also was given a self-defense instruction. We conclude that the instruction defining "participant" did not relieve the State of its burden or directed the verdict on an essential element.

Bell also argues that by giving the instruction on the definition of "participant," the

15

judge improperly commented on the evidence by conveying "the judge's conclusion that Mr. Alexander was a 'victim.'" We find that this instruction did not constitute an unconstitutional judicial comment on the evidence.

Trial judges are constitutionally prohibited from commenting on evidence. CONST. art. IV, § 16. The purpose of this rule is to prevent the jury from being influenced by a trial judge's personal opinion on the credibility, weight, or sufficiency of the evidence. State v. Jacobsen, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). To be a comment on the evidence, it must appear that the trial court's attitude toward the merits of the case is reasonably inferable from the nature or manner of the court's statements. State v. Lane, 125 Wn.2d 825, 889 P.2d 929 (1995). A judge's opinion may be conveyed directly or by implication, based on the particular facts and circumstances of the case. Jacobsen, 78 Wn.2d at 495. "A jury instruction that does no more than accurately state the law pertaining to an issue, however, does not constitute an impermissible comment on the evidence by the trial judge." State v. Brush, 183 Wn.2d 550, 557, 353 P. 3d 213 (2015) (quoting State v. Woods, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001)).

The instruction provided by the trial court in this case was an accurate statement of the law and correctly instructed the jury that in order to convict Bell of felony murder, the state was required to prove that Alexander was not a participant in the felony underlying the offense. The jury also was free to accept or reject Bell's self-defense claim and determine whether Bell committed assault in the second degree. The judge did not convey an opinion that Alexander was the "victim" by giving the instruction.

16

First Aggressor Instruction

Bell also contends that there was insufficient evidence to support the first aggressor instruction given to the jury, which Bell objected to. We disagree.

Whether the State produced sufficient evidence to justify a first aggressor instruction is a question of law reviewed de novo. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). "Words alone do not constitute sufficient provocation" for a first aggressor instruction. State v. Riley, 137 Wn.2d 904, 911, 976 P.2d 624 (1999). Additionally, the provoking act cannot be the actual assault charged. Bea, 162 Wn. App. at 577; State v. Kidd, 57 Wn. App. 95, 100, 786 P.2d 847 (1990).

An aggressor forfeits the right of self-defense. Craig, 82 Wn.2d at 783. A "first aggressor" instruction explains to the jury that the State may disprove self-defense "by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense." State v. Grott, 195 Wn.2d 256, 268, 458 P.3d 750 (2020). The aggressor cannot claim self-defense "because 'the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense.'" Riley, 137 Wn.2d at 911 (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, Jr., SUBSTANTIVE CRIMINAL LAW § 5.7(e) at 657-58 (1986)). A "first aggressor" instruction is appropriate, "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." Id. at 909. Such an instruction is also appropriate where there is conflicting evidence as to whether the defendant's conduct precipitated a fight. State v. Wingate, 155 Wn.2d 817, 823, 122 P.3d 908 (2005).

Here, the jury was presented with conflicting evidence as to whether Bell's

17

conduct precipitated a fight. Donnie testified that he observed the incident between Bell and Alexander. From his vantage point at the front door to the house, he had a clear view of the front yard where the incident took place. Donnie testified that Bell attacked Alexander, knocking him to the ground and continued to hit him multiple times when Alexander never touched or took a swing at Bell. Bell presented conflicting evidence. Bell testified that after he threw Brenda's phone, Alexander followed him out of the house and said "[g]oddamn it, Warren, why the fuck you do that for?" Bell said that as he turned around toward Alexander, Alexander "was already up on" Bell and punched Bell in the face. Bell responded by hitting Alexander once on the left side of the face, near his cheek. He then jabbed Alexander in the face again after Alexander grabbed Bell trying to drag him to the ground and kicking Bell in the head. According to Bell, when Alexander still had a hold of Bell's arm and "kneed" him, Bell responded by hitting Alexander in the jaw.

Despite the conflicting evidence presented, evidence did support giving the first aggressor instruction. The trial court did not err in doing so.

<u>Sustained Objections</u>

Bell next contends that the trial court improperly sustained an objection to the defense attorney's summary of the evidence during closing argument. Bell argues that by sustaining the objections, the trial court limited the ability of defense counsel to argue that the force used by Bell was reasonable.

A trial court's decision to limit closing argument is reviewed for abuse of discretion. <u>State v. Wooten</u>, 178 Wn.2d 890, 897, 312 P.3d 41 (2013) (citing <u>State v. Perez-Cervantes</u>, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)). The trial court abuses its

discretion "only if no reasonable person would take the view adopted by the trial court." Id. (quoting State v. Huelett, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)) (internal citations omitted).

The issue arose out of defense counsel's summary of the medical examiner's trial testimony. During his testimony, defense counsel questioned the medical examiner about how the injuries on Alexander's face and head were consistent with a punch:

Q: And so you would have maybe injuries that are consistent with a punch to the left cheek, a punch to the right, cheek, maybe a punch to the jawbone area.

A: There's also the abrasion on the right forehead.

Q: Yeah, the right forehead. So maybe consistent with maybe four punches or something like that?

A: Yes.

On redirect, the State clarified whether the medical examiner was able to calculate the number of blows sustained by Alexander based on his injuries.

Q: Defense counsel was asking you about the injury and saying one punch, two punches. If someone's punched twice in the same location on their cheek, can you definitely, can you differentiate between one punch or two punches?

A: Sometimes, sometimes not, particularly at this late date. It gets very difficult.

Q: So someone could be struck multiple times in the same place –

. . . .

Q: Would it be possible for someone to be struck multiple times in the same place and you wouldn't be able to differentiate the number of blows?

A: That's true.

The defense re-crossed Dr. Thiersch,

Q: And when you noted the injuries on his face, could you differentiate more than one punch in any of the areas that you've identified, either than his left cheek or his forehead, a little bit on his right cheek, a little bit below his lip? Could you differentiate any other blows?

A: No.

In closing argument, the State made two objections to defense counsel's characterization of the medical examiner's testimony. The State first objected when Bell's defense attorney argued that the "Medical Examiner, Dr. Thiersch, basically talks about contusions on Mr. Alexander's forehead, right cheek, left side of face that are consistent with being struck four times." The State objected, arguing facts not in evidence and that counsel was misstating the testimony. The trial court sustained the objection. Defense then argued to the jury, "He counts what he believes to be the number of blows." The State objected again, arguing that counsel was misstating the testimony. The trial court sustained the objection in the midst of defense counsel immediately responding by telling the jury, "I'm going to let you all refer to your notes because we obviously have a different perspective . . . about what Dr. Thiersch said about how many blows were inflicted based upon what it is he observes."

Under the abuse of discretion standard, we conclude that the trial court did not abuse its discretion in sustaining the objections. During cross examination, the medical examiner answered affirmatively to defense counsel's question asking if Alexander's facial injuries were "*maybe* consistent with *maybe* four punches or something like that?" (Emphasis added.) The medical examiner clarified that at the time of the examination, long after the incident, it would be very difficult to be able to determine if any single injury resulted from a single or multiple strikes. He added that the injuries were not consistent with just falling down and that the injuries to Alexander's brain were

20

consistent with being struck multiple times in the head or face.

During closing argument, however, the defense counsel's arguments suggested that the medical examiner definitively testified that the injuries were consistent with being struck four times and that the medical examiner had counted what he believed to be the number of blows. That was not the medical examiner's testimony.

Bell also argues that the trial court's sustaining the objections amounted to an unconstitutional judicial comment on the evidence. Because defense counsel's closing argument invited the prosecutor's objection, the trial court did not comment on the evidence in making its "concise, accurate, [and] judicious ruling." State v. Rowley, 74 Wn.2d 328, 333, 444 P.2d 695 (1968).

Even if it was error to sustain the objections, the action is subject to a harmless error analysis. Non-constitutional error "is harmless unless there is a reasonable probability, in light of the entire record, that the error materially affected the outcome of the trial." State v. Webb, 64 Wn. App. 480, 488, 824 P.2d 1257; accord State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). A "'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." State v. Chavez, 76 Wn. App. 293, 297, 884 P.2d 624 (1994) (quoting United States v. Bagley, 473 U.S. 667, 682, 106 S. Ct. 3375, 87 L. Ed. 2d 401 (1985)).

Bell cannot show there was a reasonable probability that the sustained objections affected the outcome of the trial. It was undisputed that Alexander was struck multiple times. Additionally, there was no testimony that Alexander's injuries could only have resulted from being struck more than four times.

We conclude that the trial court did not abuse its discretion in sustaining the

21

objections, but even if it was error, that error was harmless.

Offender Score

"We review a sentencing court's calculation of an offender score de novo."  State v. Tili, 148 Wn.2d 350, 358, 60 P.3d 1192 (2003). The sentencing court follows the guidelines of the Sentencing Reform Act (SRA) to calculate an offender's score.  See RCW 9.94A.525, .510.  In calculating an offender score, the sentencing court must (1) identify all prior convictions, (2) eliminate those that "wash out," and (3) count the prior convictions that remain. State v. Moeurn, 170 Wn.2d 169, 175, 240 P.3d 1158 (2010). The State must prove the existence of prior convictions by a preponderance of the evidence.  In re Pers. Restraint of Adolph, 170 Wn.2d 556, 566, 243 P.3d 540 (2010).

*A. Same Criminal Conduct*

For the first time on appeal, Bell challenges the trial court's calculation of his offender score used at sentencing.  Bell first argues that the trial court failed to determine whether two of Bell's prior convictions constituted the same conduct, thereby lowering his offender score.

If a trial court finds that some or all of a defendant's crimes encompass the same criminal conduct, the court must count those offenses as a single crime for purposes of calculating the defendant's offender score.  RCW 9.94A.589(1)(a).  Crimes constitute the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim."  RCW 9.94A.589(1)(a).  We construe the statute narrowly and the burden is on the defendant to show that the two convictions amount to the same criminal conduct.  State v. Canter, 17 Wn. App. 2d 728, 741, 487 P.3d 916, review denied, 198 Wn.2d 1019, 497 P.3d 375 (2021).

Bell contends that two of the convictions used to calculate his offender score constituted the same criminal conduct and should have counted as one offense for those purposes. Bell argues that his convictions for assault and harassment likely constitute the same criminal conduct because they were committed on the same day and concurrent sentences were imposed at the same sentencing hearing.[4]

Because Bell did not raise this issue below, we deem it waived. State v. Nitsch, 100 Wn. App. 512, 521, 997 P.2d 1000 (2000).

*B. Prior Conviction*

Bell next asserts that the statute under which he was previously convicted for cyberstalking is unconstitutional, therefore the trial court erred in including that conviction as part of his offender score.

The State need not prove the underlying constitutional validity of convictions used to calculate a defendant's offender score. State v. Ammons, 105 Wn.2d 175, 187, 713 P.2d 719, 718 P.2d 796 (1986). But a defendant may challenge a prior conviction that is facially invalid—meaning "a conviction which without further elaboration evidences infirmities of a constitutional magnitude." Id. at 188. "A conviction based on an unconstitutional statute cannot be considered in calculating the offender score." State v. LaBounty, 17 Wn. App. 2d 576, 581-82, 487 P.3d 221 (2021). A sentence based on a miscalculated offender score results in "a complete miscarriage of justice" and the remedy is remand for resentencing under a corrected offender score. In re

---

[4] Bell's criminal history attached to his judgment and sentence shows an assault and harassment convictions under the same cause number with the same sentencing date. Bell also cites to "Sentencing Ex. 3," but the exhibits admitted at the sentencing hearing are not included in the record before this court. "The party presenting an issue for review has the burden of providing an adequate record to establish such error . . . ." State v. Sisouvanh, 175 Wn.2d 607, 619, 290 P.3d 942 (2012).

<u>Pers. Restraint of Sylvester</u>, 24 Wn. App. 2d 769, 777, 520 P.3d 1123 (2022) (quoting <u>In re Pers. Restraint of Goodwin</u>, 146 Wn.2d 861, 876, 50 P.3d 618 (2002)). Generally, a criminal defendant does not waive a challenge to a miscalculation of an offender score by failing to object in the sentencing court. <u>Goodwin</u>, 146 Wn.2d at 873-74.

Bell was previously convicted of cyberstalking under RCW 9.61.620(1)(a) and (1)(c) after he sent a text message to his wife saying:

> Bitch i hope u show them this bitch u want to control me ill kill u and them whenever they don't know shit tell them to go home or else its on.

<u>State v. Bell</u>, No. 70358-7-I, slip op. at 3 (Wash. Ct. App. Sept. 22, 2014) (unpublished) https://www.courts.wa.gov/opinions/pdf/703587.pdf.[5] This court subsequently upheld his conviction. <u>Id.</u>

Following Bell's conviction and appeal, portions of the statute have been found to be unconstitutional. <u>See</u> <u>Rynearson v. Ferguson</u>, 355 F. Supp. 3d 964, 972 (W.D. Wash. 2019) (holding that RCW 9.61.260(1)(b) is unconstitutionally overbroad);[6] <u>State v. Mireles</u>, 16 Wn. App. 2d 641, 656, 482 P.3d 942 (2021). The <u>Mireles</u> court held that RCW 9.61.260(1)(a) was unconstitutionally overbroad because it included an "intent to embarrass." <u>Id.</u> at 654-55. However, the court struck the word "embarrass" from the statute and upheld the remainder. <u>Id.</u> at 656. Because Bell's conviction did not rely on an allegation that included an intent to "embarrass" and was not based on RCW 9.61.260(1)(b), Bell has not shown that his previous conviction of cyberstalking is facially

---

[5] GR 14.1(c) provides that "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions."

[6] This court has applied <u>Rynearson</u> and found the statute constitutionally overbroad. <u>See also</u> <u>State v. Ford</u>, No. 54086-0-II, slip op. at 11 (Wash. Ct. App. Nov. 2, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054086-0-II%20Unpublished%20Opinion.pdf; <u>Slotemaker v. State</u>, No. 78665-2-I, slip op. at 1 (Wash. Ct. App. July 15, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/786652.pdf.

invalid.

*C. Rounding Down*

Bell finally challenges the trial court's calculation of his offender score as "12.5," where Bell asserts it should have been calculated as 12. Bell argues that because of the error, this court should remand for a resentencing hearing.

To determine a sentencing range under the SRA, a defendant is awarded "points" for each prior conviction under the parameters set out in RCW 9.94A.525. The offender score is calculated by "the sum of points accrued under [RCW 9.94A.525] rounded down to the nearest whole number" combined with the seriousness level of the offense, which together provide the standard sentencing range. RCW 9.94A.525; RCW 9.94A.510. During sentencing the prosecutor clarified that the offender score was "12."[7] The record suggests the listing of the offender score as "12.5" was a scrivener's error.

"Where the standard sentencing range is the same regardless of a recalculation of the offender score, any calculation error is harmless." State v. Priest, 147 Wn. App. 662, 673, 196 P.3d 763 (2008) (citing State v. Fleming, 140 Wn. App. 132, 138, 170 P.3d 50 (2007)). If the error in the offender score does not change the defendant's standard range, we need not remand. State v. Argo, 81 Wn. App. 552, 569, 915 P.2d 1103 (1996). In this case, there is no difference in the sentencing range for an offender score of 12 rather than 12.5. See RCW 9.94A.510. As a result, we find the error was harmless and deny the request to remand for correction.

---

[7] The State previously submitted a sentencing memo that calculated the offender score as 10.

25

Statement of Additional Grounds[8]

*A. Preliminary Hearing*

Bell argues that he was denied a preliminary hearing, which denied his right to object to a tainted determination of probable cause. Bell states he was "[r]estrained illegally over 48 hours" and was confined for 13 days prior to his arraignment. Bell fails to provide a sufficient record upon which to review this claim. We decline to review this issue because of material omissions in the record. State v. Wade, 138 Wn.2d 460, 465, 979 P.2d 850 (1999). Arguments that rely on facts outside the record on appeal must be raised in a Personal Restraint Petition. State v. McFarland, 127 Wn.2d 322, 388 n.5, 899 P.2d 1251 (1995); RAP 16.3.

*B. Ineffective Assistance*

Bell next argues that his trial counsel was ineffective for entering a stipulation without his knowledge or consent.

Alexander's neighbor, Gouran, testified that he saw Bell pick something up and throw it toward the front window, breaking the glass window. Instead of defense calling a rebuttal witness, the parties entered a stipulation during trial agreeing that the house where the assault occurred did not have any broken windows on the relevant date.

To show ineffective assistance of counsel, Bell must establish that his counsel's performance was both deficient and resulted in prejudice. State v. Grier, 171 Wn.2d 17,

---

[8] Bell asserts additional conclusory claims that three witnesses, Gouran, Brenda, Donnie, and a detective committed perjury by knowingly lying under oath. He also asserts that the prosecutor committed misconduct by calling these witnesses knowing they would be committing perjury. The only support Bell cites is an affidavit he submitted with his statement of additional grounds from his father that was signed on July 29, 2022, well after the trial, summarily stating that he was told by Bell's wife that Donnie would lie under oath. We decline to consider these unsupported claims. RAP 10.3(a)(6); Cowiche,118 Wn.2d at 809.

32-33, 246 P.3d 1260 (2011); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Bell cannot show that his counsel's performance was deficient. The Washington State Supreme Court has held that when a stipulation is agreed to by a defendant's attorney in the presence of the defendant, the trial court may presume that the defendant consents, *unless the defendant objects at the time the stipulation is made*. State v. Humphries, 181 Wn.2d 708, 715, 336 P.3d 1121 (2014) (citing United States v. Ferreboeuf, 632 F.2d 832, 836 (9th Cir. 1980)). Bell was present when the parties discussed the defense possibly calling a rebuttal witness. The parties discussed the stipulation on the record in Bell's presence. This stipulation was read to the jury in Bell's presence. The record contains no evidence of Bell expressing surprise as to the stipulation or objecting to it.

We hold that Bell's claim of ineffective assistance of counsel fails.

### Victim Penalty Assessment

Bell argues that this court should strike the $500 VPA imposed on Bell as a mandatory fee at sentencing. As part of Bell's sentence, he was ordered to pay all mandatory fees and assessments, but nonmandatory fees were waived.

Pursuant to the new provision of RCW 7.68.035(4), effective July 1, 2023, trial courts shall not impose the VPA on defendants found indigent at the time of sentencing. LAWS OF 2023, ch. 449, § 1. Upon motion by a defendant:

> [T]he court shall waive any crime victim penalty assessment imposed prior
> to the effective date of this section if:
>
> ....

(b) [t]he person does not have the ability to pay the penalty assessment. A person does not have the ability to pay if the person is indigent as defined in RCW 10.01.160(3).

RCW 7.68.035(5). This new provision applies here because it went into effect before Bell's direct appeal was complete. State v. Ellis, No. 56984-1-II, slip op. at 12 (Wash. Ct. App. June 13, 2023), https://www.courts.wa.gov/opinions/pdf/D2%2056984-1-II%20Published%20Opinion.pdf (citing State v. Ramirez, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)).

Bell argues in his motion for reconsideration that the trial court found him indigent at sentencing. In Bell's sentencing memorandum, he asked the court to find him indigent and waive all non-mandatory financial assessments. The State made no statement, written or oral, as to its position regarding LFOs or whether the defendant was indigent. The judgment and sentence reflect that the court waived court costs and recoupment of attorney fees, and the court stated during the sentencing hearing that it intended to only impose mandatory legal financial obligations (LFOs), which included, at that time, the VPA. However, the court did not make a specific finding as to whether Bell was indigent as defined in RCW 10.01.160(3).[9] The State concedes that Bell is indigent and is ultimately entitled to relief. In the interest of judicial economy, the State supports remanding to strike the VPA under RCW 7.68.035(4). We remand for the trial court to correct the judgment and sentence by striking the VPA. See State v. Hixson, 83877-6-I, slip op. at 12 (Wash. Ct. App. July 31, 2023), unpublished, https://www.courts.wa.gov/opinions/pdf/838776%20%20order%20and%20opinion.pdf.

---

[9] At the time of sentencing, the trial court was only required to conduct an inquiry into a defendant's ability to pay in order to impose non-mandatory fees and costs. State v. Blazina, 182 Wn.2d 827, 838-39, 344 P.3d 680 (2015).

CONCLUSION

Because he did not raise the issue below, Bell waived his claim that his sentence was based on an inaccurate offender score reflecting two previous convictions based on the same criminal conduct. Though he is correct that offender scores must be rounded down and the score listed on his judgment and sentence is "12.5," a correction would not change Bell's standard range. Thus, we need not remand to correct that error. However, because RCW 7.68.035(4), which went into effect while this case was on direct appeal, prohibits a court from imposing the VPA on an indigent defendant, we remand for the court to strike the language in the judgment and sentence imposing the VPA. Because Bell has not established a basis for relief as to his other claims, we otherwise affirm.

_Coburn, J._

WE CONCUR:

_Chung, J._  _Dwyer, J._