IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>       Respondent,<br><br>  v.<br><br>OWEN GALE RAY,<br><br>       Appellant. | No. 86163-8-I<br><br>ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

The Appellant, Owen Gale Ray, and the Respondent, State of Washington, have both moved for reconsideration of the unpublished opinion filed on July 22, 2024. The panel has considered the motions and has determined that the motions should be denied, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the appellant's and the respondent's motions for reconsideration are denied; and it is further

ORDERED that the unpublished opinion filed on July 22, 2024, is withdrawn; and it is further

ORDERED that a substitute unpublished opinion be filed.

_____
Coburn, J.

_____  _____
Díaz, J.            Chung, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

v.

OWEN GALE RAY,

                Appellant.

No. 86163-8-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Owen Ray was convicted of assault in the second degree and felony harassment following an incident in which he pointed a gun at his wife, which resulted in his wife and children fleeing the family home after police arrived. Ray argues that the trial court improperly admitted patrol car video capturing conversations between his children without the children's consent, in violation of Washington's Privacy Act. At issue is whether exigent circumstances existed that met a statutory exception to requiring police to notify the children they were being recorded. We need not resolve that dispute because any error in admitting the recording was harmless. Ray also challenges the admission of ER 404(b) evidence that he had previously assaulted his wife. Ray additionally argues that the trial court improperly excluded a defense expert witness, that the prosecutor committed misconduct in closing, and that his convictions violate double jeopardy. We affirm.

FACTS

In 2020, Ray and K.R. lived with their three children and dog in DuPont, Washington after Ray was transferred to a new position at Joint Base Lewis- McChord. Ray was a colonel in the United States Army. The marriage began to deteriorate a few years before the family moved to DuPont. Ray began drinking hard alcohol frequently, developed a quick temper, and would swear at K.R. As Ray's drinking became more frequent, he progressed from yelling to throwing objects.

In the last six months or so of 2020, Ray would comment about having the control in the relationship, telling K.R. she could not leave him and threatening to "sell th[e] house out from under" her. At issue in this case are two incidents. The first occurred during the summer or fall of 2020 in the front entry way of the family home. The second, the basis for the convictions, occurred the day after Christmas the same year.

During the first incident, Ray was "yelling and cussing" in the front entry way of their home when he grabbed K.R. by the chest and pushed her into the wall by the front door, causing K.R. to hit her head on the wall. Though K.R. slept in a locked guest bedroom that night, she did not report the incident and eventually went back to the couple's shared bedroom.

Ray again was "yelling and cussing" at K.R. on the evening of December 26. He had been drinking and became very angry at K.R., accusing her of undermining him in regards to figuring out how their oldest daughter would get to work the next day. While the children and K.R. got ready for bed upstairs, Ray texted K.R., "Way to destroy a father's credibility, as always. Done with this shit."

Ray again got in K.R.'s face, calling her names when she returned to the first floor to attend to the family dog, who recently had surgery, and asked Ray to stop yelling. K.R. told Ray to "back off" and stated that she was going to bed. After K.R. returned to the second floor, she could hear Ray become louder and "really aggressive in what he was saying." Ray said "you want to do this?" "let's do this," and "fine I don't care" while pacing in their front entryway. K.R. explained Ray "sounded like he was coming up to pick a fight with me." K.R., from the second floor, saw Ray put on his shoes in the front entry, so K.R. went to the third floor, believing that Ray would not pick a fight with her in front of the children, whose bedrooms were on the third floor.

After getting to the third floor, K.R. observed the two youngest children asleep in the same bed together in her middle daughter's room with the door open. The oldest daughter was still in the third-floor bathroom getting ready for bed. From her location on the third-floor landing, K.R. could see Ray walk toward the garage and heard the garage door open and close. K.R. then saw Ray go to the second floor and "very aggressive[ly]" open all the doors and turn on all the lights. Concerned, K.R. dialed 911 on her cell phone, but did not hit "send." Ray then ascended the stairs to the third floor, where K.R. noticed that he was holding a gun by his side as their daughter came out of the bathroom. K.R. backed into a loft area between the bedrooms and told her daughter to go to bed. Ray said goodnight to their oldest daughter and closed her door before "immediately" turning on K.R. and yelling at her.

K.R. told Ray to put the gun down and backed into their middle daughter's room, threatening to call 911. Ray told K.R. to "go ahead" and K.R. called 911 before beginning to head down the stairs. K.R. told the 911 operator that her husband was

3

"drunk," that there was a gun "on his person," and that he was "threatening me with it." Upon hearing K.R. give his name to the 911 operator, Ray came back into the room and pointed the gun at K.R. while yelling, waking up their children. Ray raised his arm and pointed the gun at K.R. telling her to hang up the phone. The children began screaming and K.R. attempted to back away from Ray, but stumbled and fell to the floor. While K.R. was on the floor, Ray kicked her in the chest, stomach, and ribs while continuing to point the gun at her. The 911 recording captured Ray yelling, "you are going to force me to kill myself" and "turn it off right now." K.R. told the operator that she and the children could not get out because "he's blocking it" and "if I talk to you he's going to kill me."

K.R. believed she would be shot and did not want her children to see that, so she moved herself to a small opening between her daughter's bed and closet where they could not see her. Ray continued to kick her, kicking her face and causing K.R. to hit her head on the wall. The youngest children were in bed screaming for Ray not to kill their mother or them and begging him to "go away."

Ray then briefly left the room before returning and pointing the gun at K.R. while yelling again. The second time Ray left the room, K.R. got up and locked the door, attempting to barricade it with her daughter's bookcase. On the 911 recording, K.R. tells the operator that "he's going to kill my kids. Help us." When Ray returned to the room and found the door would not open, he kicked until it broke open, sending the bookcase toward K.R. and causing her to again fall to the floor. Ray then pointed the gun at his two children on the bed, who were "hysterical." The youngest child can be heard on the 911 recording crying and saying, "I don't want to die." Ray responds by

4

saying, "you're going to be safe buddy. Don't worry about it." Ray continued to swear at K.R., called her names and then said, "you are safe. The kids are safe. You will go to fucking hell." K.R. positioned herself between the gun and the children while Ray waved the gun around, continuing to point it at K.R. with the children behind her. Ray then backed up to the doorway and turned off the light before raising the gun toward K.R. and the children.

K.R. remained on the line with 911 during the entirety of the incident. In the recording of the phone call, Ray can be heard yelling at K.R., calling her an "asshole" and a "psycho fuck." Ray repeatedly stated "good job" to K.R. and told her to "go to fucking hell." K.R. believed Ray was going to shoot her and the children before he left the room. Ray began yelling about how he could see police outside. Officers from three nearby police agencies had arrived just after midnight and established a perimeter around the house.

K.R. grabbed the children and started for the door before being blocked by Ray. K.R. told Ray to "let them go. Be a dad" and he took a step back. K.R. and the children were able to move past Ray and run to the front door. The couple's oldest daughter had remained in her bedroom on the third floor during the assault and had also called 911. In the call, the oldest daughter said, "My dad's trying to kill himself and he might try to kill my mom, my little sister and my little brother." The oldest daughter said her father threatened her mom and siblings. When the 911 operator asked if he said he was going to harm them, the daughter said, "No, but they're screaming." The daughter said her father said he was not going to surrender and that he was going to kill himself.

When K.R. left the bedroom, she screamed for her oldest daughter to leave the

house before running out the front door with the two youngest children. Dash camera footage from a responding police car shows K.R. and the two youngest children running from the home screaming, followed moments later by the oldest daughter. K.R. and the children were rushed into a waiting patrol car and immediately driven away from the house so they were no longer within Ray's eyesight. Patrol car cameras recorded the backseat conversations starting at 12:39 a.m. At 1:05 a.m., an officer alerted K.R. and the children that they were being video and audio recorded while in the back seat.

Responding officers observed Ray enter and exit the balcony on the home's third floor and place a handgun to his head each time he exited. Officers could hear a handgun being "racked" in an attempt to chamber a round. Lakewood police sergeant Jason Catlett was able to contact Ray by phone. On the call, Ray said "I will fucking kill every single one of you; it will be a fucking blood bath." Ray also told the sergeant to "go find out" who Ray was, which the sergeant understood to be a threat based on his later understanding of Ray's military background. The sergeant explained that the nature of the threats appeared to be "there is nothing left for me; I've ruined this. My career is over. I've made a mess of my life. If you come in here, I'm going to kill you."

After entering and exiting the balcony several times, Ray returned inside the house and turned off the lights. As a result, officers on scene could no longer see his location in the house. Officers then heard the "distinct" sound of a pump action shotgun being manipulated. The sergeant was again able to get in touch with Ray by phone and spoke with him several times. Ray began to calm down. Ray eventually agreed to come out of the house and was arrested without incident.

Ray was charged with seven counts by way of a second amended information:

Count I (kidnapping K.R. in the first degree), Count II (assault in the second degree against K.R.), Count III (assault in the second degree against K.R.), Count IV (felony harassment, threat to kill, against K.R.), Count V (reckless endangerment); Count VI (felony harassment, threat to kill, against sergeant Jason Catlett), Count VII (felony harassment, threat to cause bodily injury, against sergeant Jason Catlett).  At trial, Ray presented a diminished capacity defense, based on his post-incident diagnosis and treatment for post-traumatic stress disorder.  Ray and K.R. testified at trial, but none of the children were called to testify.  The 911 calls were admitted as well as videos from dash cameras, body cameras, and footage from the backseat of the patrol vehicle where the children sat after fleeing the home.  After the State rested its case, the court dismissed one count of assault in the second degree because the kicking of K.R. did not result in substantial bodily injury.

A jury found Ray guilty of counts II (assault in the second degree against K.R.), IV (felony harassment, threat to kill, against K.R.), and V (reckless endangerment).  The jury also found Ray was armed with a firearm on counts II and IV.  Ray was acquitted on all remaining counts.  For the purposes of sentencing, the court found the assault and felony harassment constituted the same course of conduct.  The court sentenced Ray to a total of 60 months confinement.

Ray appeals.  Additional relevant facts are set out below.

## DISCUSSION

### Washington's Privacy Act

Ray first challenges the admission of video of his children's conversation in the patrol car after their escape from the house, arguing it was admitted in violation of the

state's Privacy Act.

After K.R. and the children fled the house, all four were directed into the back of a patrol vehicle and driven to a different street so they would no longer be visible from the family's home, where the defendant remained armed and in a standoff with police. After coming to a stop, the officer driving the car can be heard asking K.R. questions pertinent to the safety of the officers on scene, including where Ray was in the house, his access to firearms in the home, the types of firearms in the home, and Ray's phone number. The officer can be heard relaying the information from K.R. to other officers by radio. Seven minutes into the video, at 12:47 a.m., officers ask K.R. to step outside to answer additional questions. Body camera footage documented that questioning had transitioned from the immediate risk Ray posed to responding police to interviewing K.R. about what she had just experienced. The officer driving the patrol car was not involved in this questioning.

After K.R. left the car to speak to officers, the three children were left alone in the patrol car. The children tried to comfort each other while discussing what had just happened and how they felt. While officers spoke to K.R., at least one other officer, possibly the one who drove children and K.R., can be seen standing near the patrol vehicle who was not engaged in interviewing K.R. and not actively involved in responding to the scene at the house which was at a different location. No officers spoke to the children or attended to them until 1:05 a.m., when K.R. returned to the vehicle. It was then that the officer who had been interviewing K.R. outside the patrol vehicle, saw the children and notified all the occupants that they were being video and audio recorded while in the back seat.

8

Washington's privacy act makes it unlawful to record any private conversation without obtaining the consent of all parties to the conversation.[1] RCW 9.73.030(1)(b). Information obtained in violation of this provision "shall be inadmissible in any civil or criminal case" in the courts of Washington. RCW 9.73.050. The statute does provide an exception for emergency response personnel. Law enforcement officers are permitted to make "sound recordings that correspond to video images recorded by video cameras mounted in law enforcement vehicles." RCW 9.73.090(1)(c). Law enforcement are generally required to "inform any person being recorded by sound under this subsection (1)(c) that a sound recording is being made" and the statement informing them is required to be captured in the recording. RCW 9.73.090(1)(c). This is not required, however, "if the person is being recorded under exigent circumstances." RCW 9.73.090(1)(c). If a recording falls under the exceptions provided in RCW 9.73.090, it may be admissible in court. RCW 9.73.090(3). When an officer is required to inform the person about the recording but fails to do so, the recording's exclusion is the remedy. Lewis v. Dep't of Licensing, 157 Wn.2d 446, 452, 139 P.3d 1078 (2006).

The parties do not dispute that the conversations were both private and recorded without the consent of the children. Though an officer eventually informed the children they were being recorded by video and audio, this occurred after obtaining the recorded statements that were admitted at trial. At issue is whether police were not required to inform the children that they were being recorded because the recording was made under exigent circumstances. The statute does not define "exigent circumstances."

Ray contends that the children's conversation took place in a patrol vehicle

---

[1] The act includes exceptions for emergencies, threats, and the investigation of specific crimes, but those exceptions do not apply here. See RCW 9.73.030(2), .210, .230.

located in a safe location away from the ongoing standoff between Ray and other responding police. This was after the patrol's driver already gathered initial information from K.R. about Ray. Thus, Ray argues, the exigent circumstances exception does not apply. The State counters that the police's ongoing focus on how best to respond to the standoff with Ray who had access to firearms qualifies as exigent circumstances.

We need not address whether the circumstances here qualify as "exigent" under RCW 9.73.090(1)(c). Even if we assume, without deciding, the trial court erred in admitting the recording, the error was harmless.

"Admission of evidence in violation of the privacy act is a statutory, and not a constitutional violation." Courtney, 137 Wn. App. at 383 (citing Cunningham, 93 Wn.2d at 831). Non-constitutional error "is harmless unless there is a reasonable probability, in light of the entire record, that the error materially affected the outcome of the trial." State v. Webb, 64 Wn. App. 480, 488, 824 P.2d 1257; accord Cunningham, 93 Wn.2d at 831. A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Chavez, 76 Wn. App. 293, 298, 884 P.2d 624 (1994) (quoting United States v. Bagley, 473 U.S. 667, 682, 106 S. Ct. 3375, 87 L. Ed. 2d 401 (1985)).

The statements of the children in the video related to their recounting of events, including the facts that Ray was armed, threatened K.R., pointed a gun at K.R., kicked K.R., and that the children were placed in fear by their father's actions. These facts were also introduced through K.R.'s testimony and the 911 calls. K.R. testified to each, stating multiple times that the defendant pointed a gun at her, kicked her, and that the children were "screaming" and "hysterical." The jury also viewed body camera footage of K.R. speaking to police after she exited the patrol car, in which she told them that the

10

defendant pointed the gun at her while kicking her and threatened to shoot her. Ray testified at trial that he wanted to be downstairs by himself, but that K.R. came down and wanted to argue. When asked if he remembered going upstairs with a firearm, Ray said "[v]aguely." Ray testified that he did not understand why K.R. was calling 911, but that it "destroyed" him and that moments later he saw police surround the house and realized he was "not making it out of this alive." After that, Ray testified that he did not remember hardly anything after that point

The overwhelming uncontroverted evidence establishes that there is not a reasonable probability that the admission of the challenged video of the children materially affected the outcome of the trial. We conclude that even if the court erred in admitting the recording, the error was harmless. Because we conclude any error was harmless, we need not consider Ray's subsequent argument that the video's risk of unfair prejudice outweighed any probative value under ER 403.

### ER 404(b)

Ray challenges the trial court's decision to admit evidence of the prior 2020 assault against K.R. that occurred in the entry way of their home.

"Decisions involving evidentiary issues lie largely within the sound discretion of the trial court and ordinarily will not be reversed on appeal absent a showing of abuse of discretion." State v. Nava, 177 Wn. App. 272, 289, 311 P.3d 83 (2013). A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. State v. Taylor, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019). ER 404(b) prohibits the introduction of other crimes, wrongs, or acts to prove propensity, but allows for their admission for other purposes, including proof of intent.

11

Before a trial court may admit such evidence, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). The trial court is required to conduct this balancing analysis on the record. State v. Lilliard, 122 Wn. App. 422, 431, 93 P.3d 969 (2004).

The State explained that one purpose in introducing the evidence was to show the escalating nature of Ray's conduct toward K.R. and to prove the element of fear for the harassment charge. In order to prove felony harassment, the State had to prove that Ray knowingly threatened to cause K.R. bodily injury and that it put K.R. in reasonable fear the threat would be carried out. The trial court heard testimony from K.R. regarding the assault in which Ray pushed her against the wall causing her to hit her head during an argument. "'Credibility determinations are for the trier of fact' and are not subject to review." State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)). The trial court found that the event had occurred by a preponderance of the evidence following K.R.'s testimony. The trial court then balanced the probative value against the prejudicial effect, noting that the fact the assault had occurred in the recent past and that it was another physical altercation between the defendant and K.R. made it more probative. The trial court permitted the admission of the incident.

We conclude that the trial court did not abuse its discretion in allowing the State to introduce evidence of a prior assault committed by the defendant against K.R.

## Witness Exclusion

Ray next argues that the trial court erred in excluding the testimony of a physician who diagnosed and treated Ray subsequent to his arrest.

The record reflects that the trial court made no such ruling. Instead, it shows that the defense chose not to call Dr. Chang. After the State moved prior to trial to exclude several witnesses on the defense witness list, the trial court indicated that it would not "exclude folks in a pretrial motion like this." The trial court explained that its concerns about hearsay, relevance, and redundancy would depend on the circumstances and could not be adjudicated prior to trial.

During trial, defense counsel indicated that it planned to call Dr. Chang to testify to the fact that Ray had undergone psychiatric treatment. The court again stated that it would "have to hear the witnesses, hear the specific questions, and hear the testimony," and that it would not adjudicate its concerns regarding relevance, cumulative evidence, or expert testimony from lay witnesses before they testified. The next day, defense informed the court "I am not calling Dr. Chang; he was scheduled for this morning as well. Kind of based on the direction that the case has gone and kind of the limitations, we are choosing not to proceed with Dr. Chang."

Because the defense chose to not call Dr. Chang before the court issued a ruling as to his testimony, there is no court ruling for us to review as to this issue.

## Prosecutorial Misconduct

Ray argues that the prosecutor committed misconduct in closing argument by attributing thoughts and motives to the defendant that were not in evidence. Ray did not object to these statements at trial.

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). The effect of a prosecutor's conduct is viewed in "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. Monday, 171 Wn.2d 667, 675, 275 P.3d 551 (2011) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). We first determine whether the prosecutor's conduct was improper. Emery, 174 Wn.2d at 759. If the conduct was improper, we then look to whether the prosecutor's improper conduct resulted in prejudice to the defendant. Id. at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's conduct affected the verdict. Id. Where, as here, a defendant fails to object to the prosecutor's remarks at trial, he is "deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Id. at 760-61.

The Washington Supreme Court has noted that prosecutorial misconduct found to be flagrant and ill intentioned is "in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." In re Pers. Restraint of Phelps, 190 Wn.2d 155, 170-71, 401 P.3d 1142 (2018).

A prosecutor is not permitted to appeal to the passion and prejudice of the jury through the use of inflammatory rhetoric. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Though the State has wide latitude to argue reasonable

inferences from the evidence, it is misconduct for a prosecutor to urge the jury to decide a case based on evidence outside the record. State v. Teas, 10 Wn. App. 2d 111, 126, 447 P.3d 606 (2019) (citing State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012)).

Ray argues that the prosecutors mischaracterized him as a "controlling and abusive spouse" when there were no facts in the record supporting that assertion. Ray specifically challenges two statements made in closing and rebuttal.[2] In closing, the first prosecutor said

> This was about purposefully traumatizing [K.R.]. Letting her know that it was her fault. All of this, the fact that he was going to kill himself, it wasn't his military's fault. It wasn't prior experiences there. He wasn't thinking about his time with President Obama, no.
> This was about [K.R.] and the things that she had done or not done, and he wanted to make sure that she knew that, and he also wanted to make sure that she knew that, and he also wanted to make sure that the kids knew when he was gone whose fault this was.

In rebuttal, the second prosecutor said

> Not only can he not treat her with a single modicum of respect, but he decides it's time for intimidation. He'll show her who's in charge. Nobody can challenge him; he's full of resentment. After all, quote, "You're a fucking asshole is what you are."
> How does one gain compliance? Introduce a gun. Introduce a gun in the hand of a man who hunts down his wife, door to door, on the second floor. Then up to the third floor. She'll have to listen to him now.
> He's the man of the household; he has the power; he has the control. You are a, quote, "Crazy fucking woman." And then he grabs his

---

[2] The State asserts in a Statement of Additional Authority that this court should decline to address Ray's claims regarding the prosecutor's statement in rebuttal arguments because Ray first challenged these statements in his Reply Brief. Parties may file a statement of additional authorities prior to the filing of a decision on the merits. RAP 10.8. However, Ray did identify and challenge in his opening brief specific arguments made in rebuttal closing. Ray's additional quoted rebuttal argument in his reply brief related to State's arguments made in its response brief. Ray moves to strike the State's Statement of Additional Authority Regarding Rebuttal Arguments because the State improperly included argument in its filing. We deny the motion to strike because the State complied with RAP 10.8.

15

handgun and says, quote "Come on, Hun, let's do this, man." She doesn't respect, so I'll teach you a little respect.

. . . .

And he's thinking, I've been trying to be here for my family, and how do you repay me? You ruin me. All those years of deployment after deployment, I was on track for promotion, but you ruined that. Ruined that all with that 9-1-1. So she will pay. She will pay for what she's done.

All but the last paragraph can be reasonably inferred from evidence presented to the jury. While a prosecutor has wide latitude to argue inferences from the evidence, "mere appeals to the jury's passion or prejudice are improper." Pierce, 169 Wn. App. at 552 (citing State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014)). This court has previously explained that it is "*improper* for the prosecutor to step into the *defendant's* shoes during rebuttal and, in effect, become the *defendant's* representative." Id. at 554. In Pierce, the prosecutor's "statements attributed to Pierce were calculated to portray Pierce as an impatient, amoral drug addict who refused to work and 'want[ed] [his] meth now.'" Id. (alterations in original). The court explained that "by arguing in the first person singular, the prosecutor inflamed the prejudice of the jury against [the defendant] by attributing repugnant and amoral thoughts to him." Id. We agree with the Pierce court that it is improper for a prosecutor to attribute thoughts not in evidence to a defendant in closing and rebuttal arguments. Rather than "effectively testifying about what particular thoughts [a defendant] must have had in his head," prosecutors should instead argue that the jury should infer from the evidence what a defendant's motive may have been in committing the crimes charged. Id. at 555.

While the court in Pierce held that this argument, in addition to additional improper arguments made by the prosecutor, were so flagrant and ill intentioned as to be incurable by instruction to the jury, it explained this was so because there was no evidence as to the thoughts in Pierce's head while he committed the crimes and Pierce did not testify at trial. Id. at 555-56.

The jury in the instant case heard testimony from K.R. that Ray had a quick temper and would become angry if his wife and oldest daughter "said something that wasn't respectful, or he would always say that we were undermining him." K.R. explained that Ray "just had in his mind what our priorities should be, and if we were not saying it correctly or doing something the way that he thought we should react to it, he would start yelling." K.R. also testified that Ray would tell her that she could not leave the marriage, "that he had the control." The jury heard from K.R. that Ray told her "he would sell this house out from under me, that he had all the control, and that everything was in his name." K.R. told the jury that Ray "liked to blame [K.R.] for whatever he did." K.R. testified that Ray became disproportionately irritated when a ski trip with his daughters on December 26 did not go as he planned and began "yelling and cussing" when their daughter did not want him to drive with her to work the next morning and instead asked K.R. to do it.

In addition to the testimony, the jury heard 911 calls in which Ray can be heard in the background telling K.R. to "turn it off right now." Ray can also be heard telling K.R. "good job, you psychofuck. You can deal with these kids for the rest of your fucking life, you fucking asshole. [The police are] all around our house right now. What choice do I have, [K.R.]? Good job." Ray can also be heard telling K.R.

Fuck you. You will deal with all of this. Fuck you, fucking whore" [and] "This is the reconciliation for what you have done for the last three fucking years. Now, let's fucking do this. I know how to do it. You are safe. Your kids are safe. You go to fucking hell. You go to fucking hell.

The jury also heard testimony that Ray sent text messages to K.R. complaining that her offer to drive their oldest daughter to work instead of Ray destroyed his credibility as a father "as always." After K.R. and the children fled the home and while Ray was inside with firearms and surrounded by law enforcement, he texted her "Thanks for this. Best wife ever."

However, the last paragraph of the challenged portion of the State's rebuttal appears to be improper first-person attribution of Ray's inner thoughts that goes beyond a reasonable inference from the record. While K.R. testified that Ray blamed her for ruining his credibility as a father, there was no testimony about her ruining his promotion track. Catlett reported that Ray said, "There is nothing left for me; I've ruined this. My career is over. I've made a mess of my life. If you come in here, I'm going to kill you." While this last paragraph was improper, it was not so flagrant and ill intentioned that it could not have been cured by an instruction.[3] Therefore, as Ray did not object during trial, his challenge is waived.

---

[3] In the "statement of the case" section of Ray's opening brief, he notes an additional instance of the prosecutor attributing first-person thoughts not in evidence to Ray. The prosecutor stated that, while Ray threatened to harm the law enforcement officers surrounding his home, Ray thought

My career is over, but I'll show [K.R.]. She'll have blood on her hands, and it's not just my own; she'll be responsible for the death of police. That blood will stain her for the rest of her life. The smell of it will never go away.

Ray does not repeat this statement in the argument section, but does argue that first-person attributions that are not in the record are improper. To the extent Ray's argument includes this quoted passage, other than the statement, "[m]y career is over," the rest of the statement was an overdramatization that was not supported by evidence in the record. However, the statements also were not so ill intentioned that they were not curable with an instruction.

Double Jeopardy

Ray argues that his convictions for felony harassment and assault in the second degree based on his threats to kill K.R. by pointing a gun at her violate the double jeopardy clause of the federal and state constitutions. We disagree.

Though Ray raised a double jeopardy argument below, it related to firearm enhancements that he does not repeat on appeal. Nonetheless, double jeopardy is a type of constitutional challenge that may be raised for the first time on appeal. State v. Adel, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998).

The double jeopardy clauses of the Fifth Amendment and the Washington Constitution protect a defendant from multiple punishments for the same offense. State v. Calle, 125 Wn.2d 769, 772, 888 P.2d 155 (1995); U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The legislature "has the power to define offenses and set punishments," and so double jeopardy is not offended if the legislature "intended to punish separately" crimes that constitute the same criminal act, or steps leading to a greater crime. State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005). Where the acts of the defendant result in charges under multiple criminal statutes, a double jeopardy challenge requires the court to determine whether, in light of legislative intent, the charged crimes constitute the same offense. In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2009). A double jeopardy claim is a question of law that is reviewed de novo. State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006).

"To determine whether the legislature intended to punish crimes separately, we apply the four-part test enunciated in State v. Freeman." State v. Fuentes, 150 Wn. App. 444, 449, 208 P.3d 1196 (2009) (citing Freeman, 153 Wn.2d at 765)).

19

First, we look at the statutory language to determine if separate punishments are specifically authorized. If we cannot ascertain this from the language itself, we next apply the "same evidence" test. Under that test, we ask whether one offense includes an element not included in the other and proof of one offense would not necessarily prove the other. If that is the case, we presume that the crimes are not the same for double jeopardy purposes. Third, if applicable, we use the merger doctrine to determine legislative intent even if two crimes have formally different elements. Finally, even if on an abstract level the two convictions appear to be for the same offense or for charges that would merge, we must determine whether there is an independent purpose or effect for each offense. If so, they may be punished as separate offenses without violating double jeopardy.

Id. at 449-50 (citations omitted).

Neither party claims that statutory language expresses a legislative intent to impose separate punishments for the same conduct. They are correct. See State v. Leming, 133 Wn. App. 875, 888, 138 P.3d 1095 (2006) (recognizing that the two statutes governing felony harassment and second degree assault, RCW 9A.46.020 and RCW 9A.36.021, respectively, do not contain specific provisions expressly authorizing separate punishments for the same conduct). We next turn to the remaining steps under the Freeman analysis, starting with the Blockburger test. Id. at 885 (citing Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932) (establishing "same evidence" or the "same elements" test)). This test applies where the "same act or transaction" constitutes a "violation of two distinct statutory provisions." Blockburger, 284 U.S. at 304. The analysis asks whether the crimes as charged and proven are "identical both in fact and in law." Calle, 125 Wn.2d at 777. "[D]ouble jeopardy will be violated where '*the evidence required* to support a conviction upon one of [the charged crimes] would have been sufficient to warrant a conviction upon the other.'" Orange, 152 Wn.2d. at 820 (second alteration in original) (internal quotation

20

marks omitted) (quoting State v. Reiff, 14 Wash. 664, 667, 45 P. 318 (1896)).

Ray argues that his convictions for felony harassment and assault in the second degree violate double jeopardy because they were based on the same evidence.

To convict Ray of felony harassment under RCW 9A.46.020(1)(a)(i), (2)(b)(ii), the State had to prove that Ray knowingly threatened to kill K.R. immediately or in the future and that the words or conduct of the defendant placed K.R. in reasonable fear that the threat would be carried out. In closing, the State explained that the evidence supporting the charge was "the circumstances surrounding the situation of him pointing the gun at her and yelling at her." To convict Ray of assault in the second degree under RCW 9A.36.021(1)(c), the State was required to prove that Ray assaulted[4] K.R. with a deadly weapon. In closing the State explained to the jury that the evidence supporting the charge was "we have the defendant with a gun, yelling and screaming and pointing the gun." The State relied on the same facts to prove both crimes. The State does not present any argument that the convictions were not based on the same evidence. Instead, the State relies on the last step of the Freeman double jeopardy analysis.

Even if two convictions appear to be the same offense, this court must determine whether there is an independent purpose or effect for each offense. Freeman, 153

---

[4] The jury instructions defined assault as

An assault is an intentional touching, striking, or shooting of another person that is harmful or offensive regardless of whether any physical injury is done to the person.

An assault is also an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

21

Wn.2d at 773. This court conducted that analysis in <u>Mandanas</u>, 163 Wn. App. at 720.

We held that

> [a] plain language reading indicates that the legislature intended to distinguish felony harassment and second degree assault as distinct offenses. The harassment statute specifically criminalizes threats to injure or kill another, which, standing alone, are insufficient to establish an assault. The offenses are set forth in different chapters of the Washington Criminal Code, title 9A RCW, and address different social concerns. Assault addresses concerns about physical harm; criminal harassment aims to prevent invasion of individual privacy. See RCW 9A.46.010. These differences in aim and purpose, demonstrated by the legislature's establishment of different essential elements, indicate that felony harassment and second degree assault do not constitute the same offense for purposes of double jeopardy.

<u>Id.</u> at 719-20. However, Division Two of this court found that the two crimes did violate double jeopardy in <u>Leming</u>, 133 Wn. App. at 889 (concluding under the same evidence test that the convictions for felony harassment and assault in the second degree were the same in fact and law when the State relied on the same evidence to prove both – Leming's threat to snap the victim's neck and her fear that he would carry out the threat). Division Two did not conduct an independent purpose or effect analysis in <u>Leming</u>, which was decided before <u>Mandanas</u>.

In a recent unpublished opinion, Division Two disagreed with <u>Mandanas</u>. See <u>State v. Nakamura</u>, No. 57050-5-II, slip op. (Wash. Ct. App. June 13, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057050-5-II%20Unpublished%20Opinion.pdf.[5] In <u>Nakamura</u>, the court, under the rule of lenity, concluded that the jury relied on the same acts to convict Nakamura of both felony harassment and assault in the second degree. <u>Id.</u> slip op. at 14. After applying the

---

[5] We may properly cite to unpublished opinions and discuss it as a nonbinding authority where, as here, doing so is "necessary for a reasoned decision." GR 14.1(c).

same evidence test and concluding that dual punishments are therefore presumptively not authorized, it next considered whether there is clear evidence of contrary legislative intent showing that these offenses should be punished separately. Id. slip op. at 15 (citing Calle, 125 Wn.2d at 780). Division Two concluded

> [h]ere there is no clear evidence demonstrating a legislative intent to punish felony harassment and assault separately when they are predicated on the same distinct act and cause the same distinct harm. Importantly, the crimes as charged and proven in this case address the same societal concern: threatening another person with a gun and inflicting terror on the victim. Finally, we discern no independent purpose or effect for these offenses under these unique facts.

Id. Division Two observed that the Mandanas court held otherwise, but appeared to suggest that the independent purpose language in Mandanas was dicta. Division Two noted

> In that case, the defendant pointed a gun at the victim and threatened to kill him, and also repeatedly pistol whipped the defendant on the head with the gun. Mandanas, 163 Wn. App. at 715, 721. The court went on to note that the crimes in that case were predicated on distinct acts, making it distinguishable from this case. Id. at 721. It is unclear why the Mandanas Court felt compelled to discuss the same evidence test and legislative intent given their holding that the crimes were predicated on separate and distinct acts.

Nakamura, slip op. at 15 n.7.

First, Nakamura, unlike Mandanas, is an unpublished case. See GR 14.1(a) ("Unpublished opinions of the Court of Appeals have no precedential value and are not binding on any court" but "may be cited as nonbinding authorities . . . and may be accorded such persuasive value as the court deems appropriate"). Moreover, we disagree with Division Two's independent purpose analysis. That last step in a double jeopardy analysis does not turn on the fact that two crimes are based on the same act. See Calle, 125 Wn.2d at 778 (holding that the differing purposes served by the incest

and rape statutes, as well as their location in different chapters of the criminal code, are evidence of the Legislature's intent to punish them as separate offenses despite the fact the defendant committed one act of forcibly engaging intercourse).

Independent purpose or effect is "a well established exception that may operate to allow two convictions even when they formally appear to be the same crime under other tests." Freeman, 153 Wn.2d at 778. The exception applies where there is a separate injury to "the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." Id. at 778-79 (quoting State v. Frohs, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)). "This exception is less focused on abstract legislative intent and more focused on the facts of the individual case." Id. at 779.

The other exception is when the presumption under Blockburger can be rebutted by other evidence of legislative intent. See e.g. Freeman, 153 Wn.2d at 772; State v. Womac, 160 Wn.2d 643, 655, 160 P.3d 40 (2007); Calle, 125 Wn.2d at 780 (recognizing that the presumption from the Blockburger "same evidence" test should be overcome only by clear evidence of contrary intent).

In Freeman the court analyzed whether double jeopardy is violated when an assault elevates the degree of robbery. 153 Wn.2d at 774. The State in that case similarly argued that the court could "find legislative intent to punish these crimes separately in the fact that the two statutes are directed at different evils." Id.

The Supreme Court rejected the argument observing that "in Calle, this court reviewed in detail the history and academic material bolstering its conclusion that the legislature *did* intend to combat different societal evils through the rape and incest

24

statutes" and that "[n]o such historical review appears in the briefing here." Id. at 775 (citing Calle, 125 Wn.2d at 780-81). The court further reasoned that "a per se holding that the legislature *never* intends these two crimes [assault and robbery] to merge would also require us to substantially overrule a long line of cases." Id.

Years later, the Washington State Supreme Court in State v. Arndt, 194 Wn.2d 784, 818, 453 P.3d 696 (2019), once again turned to the independent purpose analysis to hold that double jeopardy was not violated. The defendant in Arndt was convicted of murder in the first degree with an arson aggravator and arson in the first degree, both convictions from the act of starting a two-story house fire where all but one of the eight people inside were able to escape. Id. at 790. The State admitted that the convictions at issue in that case were the same under Blockburger because "aggravated murder as charged *required* proof of every element of first-degree arson." Id. at 818. The Supreme Court agreed with the State. Id. at 819. While noting that Arndt is "not exactly like Calle," the Supreme Court turned to the primary purpose of the statutes at issue as additional indication that the legislature clearly intended separate punishments for the separate crimes of first degree murder with an arson aggravator and first degree arson. Id. at 820. The Arndt court concluded that the statutes at issue were in different parts of the criminal code and that the primary purpose of the arson statute is to protect property, while the primary purpose of the aggravated murder statute is to protect human life. Id. See State v. Heng, 22 Wn. App. 2d 717, 734, 512 P.3d 942 (2022) (relying on Arndt to reject a double jeopardy violation "because Heng's arson had an effect independent of the murder and because the purpose of criminalizing arson is to protect property whereas the purpose of criminalizing murder is to protect human life,

this case falls within the 'independent purpose or effect' exception to the merger doctrine").

We follow <u>Mandanas</u> and conclude that the convictions do not violate double jeopardy because the offenses have independent purposes, which is evidence of legislative intent for dual punishments.

## CONCLUSION

We conclude that even if the trial court erred in admitting the recorded conversation of the children, any such error was harmless. Because the crimes of felony harassment and assault in the second degree have independent purposes, those convictions do not violate double jeopardy. The court did not abuse its discretion in admitting evidence of the earlier 2020 assault under ER 404(b). And because the prosecutor's challenged statements in closing argument were not so flagrant and ill intentioned that they could not have been cured with an instruction, Ray, who did not object to those statements during trial, waived that claim.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____
Díaz, J.

_____
Chung, J.

26